**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**
Plaintiff,

v.

**UNION CAMP CORPORATION,**
Defendant.

No. Civ.A. CV496–213.

United States District Court,
S.D. Georgia,
Savannah Division.

Dec. 2, 1997.

Robert P. Duffy, EEOC, Atlanta, GA, for Plaintiff.

John F. Meyers of Seyfarth, Shaw, Fairweather & Geraldson, Atlanta, GA, Joseph A. Mulherin, III of Bouhan, Williams & Levy, Savannah, GA, Frank W. Seiler of Bouhan,

Williams & Levy, Savannah, GA, for Defendant.

## ORDER

MOORE, District Judge.

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this Title VII action on behalf of Therese Robertson, a female firefighter with Union Camp's Savannah mill, alleging that Defendant Union Camp (1) condoned the existence of a hostile work environment; (2) treated her discriminatorily with regard to training, overtime and job assignments due to her sex; and (3) retaliated against her after she complained about the discrimination and harassment. Presently before this Court is Defendant's Motion for Summary Judgment (Doc. 38). Having considered carefully the parties' numerous briefs and reviewed the factual allegations and applicable law, the Court hereby **DENIES** Defendant's motion with regard to the hostile work environment claim, but **GRANTS** Defendant's motion with regard to the disparate treatment and retaliation claims. Defendant's Request for Oral Argument (Doc. 41) is **DENIED** as **MOOT**.

## FACTS

At issue in this case is not a lurid, textbook set of facts with which courts more typically were faced when Title VII first became available to remedy discrimination in the workplace. Rather, the sex discrimination alleged by the EEOC in this action is more subtle and insidious in nature, but nonetheless warrants careful consideration by this Court. The EEOC alleges that while working as a firefighter for Union Camp, Therese Robertson, the charging party in this action, was subjected to repeated harassment by her male co-workers, including supervisory employees within the fire department, on account of her status as the sole female firefighter and the only female firefighter in the history of the department. The EEOC further alleges that Ms. Robertson was treated differently on account of her sex in that she was denied certain promotional and training opportunities due to favoritism shown to her male counterparts. Lastly, the EEOC claims that Ms. Robertson's supervisors retaliated against her for complaining about the discrimination.

The case unfolds in 1988, when Ms. Robertson began her employment at Union Camp's Savannah mill as a security officer. Ms. Robertson performed well on the job and, during periodic medical examinations by a Union Camp physician, she displayed no signs of physical or mental distress.

Ms. Robertson was employed as a security officer until January 5, 1992, when she transferred to the Union Camp fire department as the first and only female firefighter in the history of the Savannah mill. Apparently, Ms. Robertson "lept" at the opportunity: the transfer fulfilled a dream of hers to join the family tradition of firefighting as her father is himself a fire chief. At that time, Ms. Robertson also preferred the day shift schedule she was offered at the fire department to the rotation shift schedule she worked as a security officer. Ms. Robertson had had some prior experience working as a volunteer firefighter since 1988 and cross-training in the fire department at Union Camp since 1991.

In June of 1992, Timothy Lewis also transferred to the fire department from Union Camp's ultragraphics department. Mr. Lewis had worked as a volunteer firefighter for approximately 10 years.

From July 1992, five individuals were stationed during the day shift at the fire station: Assistant Fire Chief Stanley Wendelken, day firefighters Robertson, Lewis, and Ivey Spence, and trainer/inspector Mike Smith. Also employed at the department were a number of shift firefighters who worked on a rotating schedule. All of the firefighters reported to Fire Chief Richard Hennie, who also supervised the security department.[1] Chief Hennie's office was located at the main gate, away from the fire department. Chief Hennie reported to Susan Morgan, an Industrial Relations Manager for Union Camp.

Assistant Chief Wendelken had a number of responsibilities at the department, including scheduling daily work for the firefighters, prioritizing tasks to be performed, assigning individuals to particular tasks, assigning

---

1. Chief Hennie died in December 1994.

overtime, running the radio, keeping attendance records and time cards, and coordinating vacation schedules. He also acted as fire chief in the absence of Chief Hennie. Chief Hennie was absent quite a bit due to health problems during 1993 and 1994.

*Work Place Conditions Within the Fire Department*

During her first year of employment at the fire department, Ms. Robertson appeared to perform her job without difficulty. Her performance ratings showed improvement and ranked her overall performance as "good." Subsequently, Ms. Robertson began experiencing problems in the workplace relating to her relationships with her male co-workers, and Assistant Chief Wendelken, Mr. Lewis, and Mr. Spence in particular.

To begin with, Ms. Robertson was the focus of a number of incidents which Union Camp defends by characterizing as pranks and teasing. These incidents included having stickers and other printed items posted on her locker, fire hat, and other equipment, containing such statements as "Jr. Fireman" and "wide load". Ms. Robertson's locker lock was glued shut. There were frequent problems surrounding the use of the locker/shower/bathroom facility, the only such facility in the fire department.[2] Although Union Camp denies the allegation, Assistant Chief Wendelken appears to have encouraged Ms. Robertson's male co-workers to hinder her access to the facility by taking deliberately long showers or locking her out entirely. (Pl.['] Ex. D (3 & 4) & O). On occasion, Mr. Lewis and Mr. Spence would lock Ms. Robertson out of the facility for no apparent reason, and at least once listened to her knock on the door while they "pitched coins." (Pl.['s] Ex. D(3) & O). Ms. Robertson also appears to have been regularly "picked at" during her lunch break, and then, on other occasions, she was ignored completely. Ms. Robertson allegedly was excluded from various activities by Mr. Lewis and Mr. Spence, such as driving with them in the "pumper truck." (Pl.['s] Ex. O).

There were also incidents surrounding the use of work equipment. Unidentified co-workers blocked Ms. Robertson's work scooter in with other equipment. Work-related items which she left on the scooter were removed and placed in front of her locker. Ms. Robertson also appears regularly to have been made to use less desirable and even faulty equipment while Mr. Lewis and Mr. Spence used the better equipment. At other times, Mr. Lewis and Mr. Spence snatched hose nozzles out of Ms. Robertson's hand when they changed hoses.

On unidentified, isolated occasions in the past, other members of the department may also have been victims of similar episodes: one employee reportedly had his locker jammed shut, and others may have had stickers or signs placed on their lockers. An advertisement for "Skinny Dip" thigh cream was posted on Mr. Lewis' locker adjacent to Ms. Robertson's.[3] At some point, an unidentified person filled Chief Hennie's boots with water.

Ms. Robertson also was treated harshly by her supervisors. Although Union Camp denies the allegation, it appears that Assistant Chief Wendelken regularly picked on Ms. Robertson, was more critical of her performance, and condoned the pranking and isolation by her co-workers. (Pl.['s] Ex. D (1 & 3) & O; Morgan I Dep.Ex. 19 (a & b)). Mr. Wendelken also assigned Ms. Robertson jobs that required more walking and/or climbing than Mr. Lewis. Chief Hennie similarly appears to have been aware of or even condoned misbehavior toward Ms. Robertson. (Pl.['s] Ex. D(3) & O; Morgan I Dep.Ex. 19 (a & b)). Mr. Smith informed Chief Hennie on several occasions that Assistant Chief Wendelken picked on Ms. Robertson. (Pl.['s] Ex. O at ¶ 7). Chief Hennie responded that he did not want to hear about it. (Pl.['s] Ex. O at ¶ 7). On one occasion, Chief Hennie cursed Ms. Robertson, in the midst of fighting a fire, when she brought him the wrong tool.

---

**2.** Because the department always had been all male, it had only one such facility.

**3.** Both Ms. Robertson and Mr. Smith, a co-worker of Ms. Robertson's, believed that the ad was directed at Ms. Robertson, although both Mr. Lewis and Ms. Robertson apparently struggled with weight loss problems.

Some of Ms. Robertson's male co-workers confirm that the work place environment at the fire department was not pleasant for Ms. Robertson:

> *Robert Coffey, shift fireman,* (Pl.['s] Ex. D(5)):
>
> "I do not believe that anyone in the department wanted Theresa [sic] there because it was breaking an age-old tradition of an all-male department. . . . . Stanley [Wendelken] is smart enough to not do things himself but allows Ivy [sic] [Spence] and Tim [Lewis] and others do [sic] things without saying anything."
>
> *Melvin Lamb, security officer,* (Pl.['s] Ex. D(2)):
>
> "I worked in the Security Division with Theresa Robinson [sic] before she transferred to the Fire Department. I was present at the main gate when Chief Hennie returned from a sick leave to find that Theresa had been transferred to the Fire Dept. . . . . He expressed displeasure over the fact that [Ms. Robertson] was now in the Fire Department. He stated that he did not want her there. . . . . I believe that Theresa has been mistreated and that every effort is being made to make her as miserable as possible."
>
> *Enoch Gardner, shift fireman,* (Pl.['s] Ex. D(4)):
>
> "I have observed Stanley [Wendelken] urge the other men do [sic] things to Theresa [sic] to cause her problems. I have seen Stanley instigate the guys to get into the showers to keep Theresa out."
>
> *Alton Griffin, shift fireman,* (Pl.['s] Ex. D(1)):
>
> "[Spence and Lewis] would make fun of Theresa [sic] or make jokes about her job performance. She seemed to take this at first but as time went on she grew tired of it and became offended. She seemed to get the worst radio and worst scooter but it might have been accidental.
>
> Spence, Lewis and Stanley seemed to pick at Theresa. Stanley would fuss because she took a break, and other little things I cannot recall. I would hate to have been treated the way they treated her."
>
> *Michael Smith, fire inspector,* (Pl.['s] Ex. D(3)):
>
> "After Spense [sic] and Lewis came to the department things seemed to happen against Theresa [sic]. I have noticed that they pick at Theresa in many ways. I know that Wendelken ignores the things that Spense [sic] and Lewis have done against Theresa. She was doing a good job but Wendelken finds something wrong with it. I get the feeling that an effort is being made to get Theresa to transfer out of the department. I have personally observed Stanley [Wendelken] time Theresa while she was on a break at the same time that Spense and Lewis were taking a break with him. He counseled her about taking too much time but said nothing to Spence and Lewis who took a 35 minute break. . . . . I have seen Spence & Lewis lock Theresa out of the locker room. I have seen them upset because she rode a scooter that they claimed as theirs. It is my belief that Stanley is behind the harassment. . . . . Spense [sic] and Lewis have ignored Theresa and would not talk to her—they isolate her. I have seen Theresa assigned a radio that did not work well. I switched radios and Tim [Lewis] and Ivey [Spence] got the bad radio to use but Stanley did not scold them the way he had Theresa.

### Overtime, Training, Job Assignments and Promotions

At the department, Mr. Lewis performed the same job as Ms. Robertson and Mr. Spence performed similar job functions. Mr. Lewis received performance evaluations of "excellent;" Ms. Robertson's evaluations were "good." Ms. Robertson was paid more than Mr. Lewis and Mr. Spence.[4] Assistant Chief Wendelken was responsible for assigning jobs and overtime as well as training opportunities.

Upon arrival at the department, Ms. Robertson received the same amount of basic

---

4. Ms. Robertson earned approximately $60 to $120 more per week than Mr. Lewis and Mr. Spence. (Sharpton Dep.Ex. 37).

firefighter training as Mr. Lewis and Mr. Ivey. Between June 1, 1992, and March 1, 1994, Ms. Robertson and Mr. Lewis both received 135 hours of formal training and/or job-related testing. (Morgan Aff. at ¶ 6 & Exs. 3 & 4).

Union Camp's overtime policy precluded an employee from overtime work during weeks in which that employee had worked fewer than forty hours. Ms. Robertson was absent from work frequently in the few months in 1994 during which she worked, limiting her from some overtime work. In 1993, Ms. Robertson was offered 261 hours of overtime, one-half hour more overtime than Mr. Lewis. (Wendelken Aff. at 2; Wendelken Dep.Exs. 9 & 10). Ms. Robertson actually worked twelve fewer overtime hours than Mr. Lewis because she declined fifteen of the hours offered. Between June and December 1992, Ms. Robertson worked 29 fewer overtime hours than Mr. Lewis. For approximately 11 weeks of that period, Ms. Robertson was precluded from overtime work due to periods of sick leave and light duty status stemming from a knee injury. Ms. Robertson was also ineligible for overtime for some of the weeks because she had worked fewer than 40 hours. Mr. Lewis was precluded from two weeks of overtime during that same period. Although Ms. Robertson believed that she had been denied overtime opportunities, she admits that, when she complained about improper distribution, she subsequently was "bombarded" and "inundated" with overtime opportunities. (Pl .['s] Ex. P at ¶ 19).

Although she initially preferred the fixed schedule of a day shift firefighter, Ms. Robertson subsequently developed an interest in becoming a shift firefighter. The fire department had four shift firefighters on staff. Shift firefighters worked a rotational schedule and received special training in "incident command" operations. Because they worked all hours, they were required to work independently. Because of the additional duties and extraordinary hours, the position had a higher salary range and was more desirable than the day shift positions. At no point during Ms. Robertson's employment at the fire department, or subsequently, was a shift firefighter position vacant.

The first step to becoming a shift firefighter was to work as a relief shift firefighter. Accordingly, Ms. Robertson began to express an interest in receiving relief shift assignments. The EEOC and Union Camp dispute whether Ms. Robertson consistently expressed interest in such work, however, or whether she instead wanted to "freeze" in her day shift schedule. Mr. Lewis expressed a consistent, aggressive interest in shift work upon joining the department, and relief shift assignments were offered to Mr. Lewis more regularly than Ms. Robertson. Although Ms. Robertson had more seniority than Mr. Lewis within the department, Chief Hennie did not believe that Ms. Robertson was qualified to perform relief shift firefighter duties. Chief Hennie supported Mr. Lewis as more qualified based on his ten years of volunteer firefighting experience, his stronger evaluations, and his consistent, keen interest in shift work.

*Ms. Robertson's 1993 Complaints*

Ms. Robertson initially did not complain about the unpleasant workplace environment or her dissatisfaction with job assignments, training and overtime opportunities, and tried to be a good sport. Eventually, however, she got fed up. She informed Chief Hennie and Assistant Chief Wendelken about the series of problems she was having in the workplace. (Robertson Dep. at 80–81).

On March 10, 1993, Ms. Robertson also spoke to Susan Morgan (Robertson Dep. at 79) because Ms. Morgan was responsible for the supervision of the fire department. Ms. Robertson complained to Ms. Morgan of a pattern of behavior by her co-workers, including the episodes of harassment and isolation which she believed were based upon her status as the only woman in the department. At that meeting, Ms. Robertson also expressed her own doubts about her abilities as a firefighter.

Although Ms. Morgan admits to having discussions with Ms. Robertson regarding the bathroom door locks (Morgan I Dep. at 82–83), Ms. Morgan conducted no investigation of Ms. Robertson's complaints. Ms. Morgan made two suggestions in response to Ms. Robertson's concerns. First, she suggested that Ms. Robertson use a locker facili-

ty in a building adjacent to the fire department.[5] Second, evidently picking up on Ms. Robertson's job insecurities, Ms. Morgan referred Ms. Robertson to counseling through Union Camp's confidential Employee Assistance Program (EAP). Ms. Morgan also approached Chief Hennie about his cursing of Ms. Robertson. The Chief subsequently met with Ms. Robertson to discuss the incident.

Following the referral to EAP, Ms. Robertson began counseling with Vivian Hathaway, a social worker. Ms. Morgan had forewarned Ms. Hathaway that Ms. Robertson was feeling harassed and vulnerable as a woman in the fire department. (Pl.['s] Ex. C). During her sessions, Ms. Robertson explained to Ms. Hathaway that she was picked on, intimidated, and criticized by her male co-workers and received less favorable jobs and training. Although Union Camp disputes the allegation, it appears that Ms. Hathaway informed Ms. Morgan about Ms. Robertson's complaints. (Pl.['s] Ex. C). Ms. Morgan's response was to suggest that Ms. Robertson transfer back to the security department. (Pl.['s] Ex. C). Ms. Robertson declined to do so, and Union Camp alleges that this was because she did not wish to return to the rotating schedule of a security officer.

Ms. Robertson complained to Ms. Morgan four or five times more in 1993 and assumed that a formal report would be conducted regarding her complaints. (Robertson Dep. at 221). Ms. Morgan, on the other hand, believed that, on the basis of her conversations with Ms. Robertson, the issues within the fire department had been satisfactorily resolved.

Shortly after her referral to EAP by Ms. Morgan, certain printed materials appeared on Ms. Robertson's locker. (Robertson Dep. at 234). One item stated "take control" and contained the slogan "don't let stress become a safety hazard." (Robertson Dep. at 235). A card with the EAP toll-free number was also affixed to her locker. (Robertson Dep. at 236). Although Ms. Robertson did not know who posted the materials, she believed that they were placed on her locker because her

co-workers had learned of her confidential visits to EAP. (Robertson Dep. at 235–37).

### The 1994 Complaint and Investigation

The last straw for Ms. Robertson fell on February 11, 1994, when Mr. Lewis and Mr. Spence hung swimsuit calendars on the outside of their lockers. Mr. Lewis' locker is immediately adjacent to Ms. Robertson's locker. Mr. Spence's locker is immediately across from Ms. Robertson's locker. The posting of this material is strictly prohibited under Union Camp's anti-harassment policy.

The calendars remained on display for several days until Ms. Robertson complained to Assistant Chief Wendelken, who directed Mr. Lewis and Mr. Spence to remove them. When Chief Hennie heard of the incident, he called Ms. Robertson to a meeting where he confronted her with pictures of newspaper lingerie ads and demanded to know if she found these ads or the calendars to be pornographic or offensive. Chief Hennie also asked Ms. Robertson whether she was sexually aroused by the pictures. Assistant Chief Wendelken had provided Chief Hennie with the lingerie ads at the request of Mr. Lewis and Mr. Spence, who believed these ads to be more revealing than the calendars.

After the confrontation, Chief Hennie contacted Jeff Sharpton, a human resource manager who worked under Ms. Morgan. Mr. Sharpton informed Chief Hennie that, regardless of whether the calendars were pornographic or whether an employee had complained, the posting of such materials violated Union Camp's policy on sexual harassment. Mr. Sharpton conducted no investigation of the incident.

On February 18, 1994, Ms. Robertson complained to Ms. Morgan about the calendar incident and the subsequent interrogation by Chief Hennie. Ms. Robertson also reiterated her earlier, 1993 complaints.

This time, in response to the complaints, Ms. Morgan conducted an investigation. Between February 18 and February 22, 1994, Ms. Morgan interviewed at least six of Ms. Robertson's male co-workers. Ms. Morgan's

---

**5.** Following this suggestion, Ms. Robertson initially made use of the adjacent building's facilities, but she remained dissatisfied because entry to the shower in that facility was blocked by other lockers. She eventually returned to using the facility located in the fire department.

notes document that those men advised her of the following:

> *Lindy Webb, shift firefighter* (Morgan I Dep.Ex. 19(a)): "[Ms. Robertson] is being harassed—mainly Chief, Stanley [Wendelken], Ivey [Spence] & Tim [Lewis]..... Pick at her at lunch. Everyone knows calendar story. Even knows about newspaper being used..... They prefer Tim—don't train her..... Stanley and Chief have 'spies'; vindictive. Harder on Therese."

> *Enoch Gardner, shift firefighter* (Morgan I Dep.Ex. 19(b)): "Department full of intimidation—Chief, Stanley [Wendelken], Tim [Lewis], Ivey [Spence]. Trying to get rid of Therese—tough on her—pick at her; intimidate her. She does a good job; tries to; wants to. Could do shift job—let her sink or swim..... Feels like 'set-up' people to get caught. They retaliate—can't prove it."

> *Robert Coffey, shift firefighter* (Morgan I Dep.Ex. 19(c)): "Therese ... doesn't get opportunity. Tim has worked alone—she hasn't. She could..... Never go to Chief or Stanley [Wendelken]—Can expect retaliation. Therese—sticker on locker—thigh cream—'you don't know who did it, but you do.' "

> *Mike Smith, inspector/instructor* (Morgan I Dep.Ex. 19(d)): "Afraid that Stanley [Wendelken] will get back at him if talked..... Therese—no confidence. Thinking about quitting. They've ruined it..... Therese asked him to quit cussing and don't make 'woman' comments—He did..... They pick on her. Now she will only do what they want her to do..... She doesn't get opportunities—Tim does all blood-borne pathogen stuff..... Chief did come talk to them and tell them not to pick on Therese. Confidence is low—She *can* do the job."

As further documented in Ms. Morgan's notes, Mr. Lewis and Mr. Spence informed Ms. Morgan of the following regarding their relationship with Ms. Robertson:

> *Tim Lewis,* (Morgan I Dep.Ex. 19(e)): "Conflict with Therese. Walking on eggshells. Never knows how she will react to anything. Gets catered to. He does 'important' work—she gets to file stuff..... Expected her to lead since she had been in

the department longer. She doesn't—He does..... He does not pick/tease her—he barely talks to her..... Confusing because things offend her but she's living with a married man and child."

> *Ivey Spence,* (Morgan I Dep.Ex. 19(f)): "One person has bad attitude—Therese. Company caters to her—Tech bathroom..... Don't know how to act around her—she jokes with her Maintenance buddies—she gets offended by Tim [Lewis] and Ivey [Spence]—'Give me the damn book, is what set her off the other day..... Company is afraid of her because she may file a charge. Don't know why they won't take a stand..... Therese doesn't like Tim or Ivey. Feels threatened—has competition. She was there first, but they are up and coming. One day she laughs at jokes and ignores cussing; one day she doesn't."

Ms. Morgan also interviewed Assistant Chief Wendelken and Chief Hennie, but apparently either took no notes or did not retain them.

On February 23, 1994, Ms. Morgan met with fire department personnel. At that meeting Ms. Morgan distributed copies of the Company's Sexual Harassment Policy. Ms. Morgan reiterated that the display of swimsuit calendars and all forms of harassment and intimidation on the basis of sex were considered to be in violation of Union Camp's sexual harassment policy.

As a result of the investigation, Ms. Morgan concluded that the calendar incident had indeed occurred, but was resolved because the calendars were no longer displayed.

*The Final Days*

Following the investigation, the situation in the fire department did not improve, and, indeed, appeared to get worse. One of Ms. Robertson's co-workers summarized the environment as follows:

> After Ms. Morgan interviewed us all during the Company's investigation of Theresa's [sic] complaints, Stanley [Wendelken] came back to the fire house and said 'I never forget. This will be over and I will still be the boss and somebody will pay.' .... Stanley has said that Theresa is not

going to be with the department long and they were going to see to it that she would not..... He gives her the worst jobs to perform. (Pl.['s] Ex. D(4)). Another stated that "after the meeting about calendars in the locker room ... [Spence, Lewis and Wendelken] seemed to ignore her...." (Pl.['s] Ex. D(1)). During this period, Mr. Lewis acknowledged that he stopped speaking to Ms. Robertson on account of her accusation of discrimination. Another co-worker stated that "Spence, Lewis and Wendelken seem to think Theresa's [sic] complaints are funny and they don't take them seriously." (Pl.['s] Ex. D(3)). Moreover, at least one of Ms. Robertson's co-workers was scolded for talking to Ms. Morgan during her investigation. (Pl.['s] Ex. D(3) & O).

Also during this period, Assistant Chief Wendelken began to closely monitor Ms. Robertson on the job, and document her activities and attendance. Mr. Wendelken kept Chief Hennie informed regarding Ms. Robertson's attendance. Mr. Wendelken also began to keep detailed personnel records on Ms. Robertson. Although Union Camp denies the allegation, there is evidence that Mr. Wendelken stopped giving Ms. Robertson jobs that would enhance her skills. (Pl .['s] Ex. O at ¶ 6). He also shortened her lunch break so he would not have to "watch her sleep." (Pl.['s] Ex. D(3)).[6] Union Camp contends that at no point during this period was Ms. Robertson's job in danger. The EEOC also alleges a deliberate, increased use of profanity by Mr. Lewis and Mr. Spence in Ms. Robertson's presence.

Ms. Morgan conducted some follow up to her investigation during this period. Mr. Smith informed her of "the truth as he saw it" that the situation had not improved. (Pl.['s] Ex. D(3)). Mr. Smith advised Ms. Morgan that Assistant Chief Wendelken exacerbated Ms. Robertson's problems with Mr. Lewis and Mr. Spence. (Pl.['s] Ex. O).

On March 2, 1994, Ms. Robertson filed a charge of discrimination with the EEOC. Following the charge, on March 4, 1994, Ms. Morgan wrote memos to the personnel files of Assistant Chief Wendelken, Mr. Lewis, and Mr. Spence regarding "intimidation and teasing" of Ms. Robertson. These memos are obliquely worded. The memo to Mr. Wendelken's file concludes that Ms. Morgan's investigation indicated that he was aware of harassment and teasing of Ms. Robertson, but noted that Mr. Wendelken denied any knowledge. The memo states that Ms. Morgan reminded Mr. Wendelken that such treatment is unacceptable and that, as Assistant Fire Chief, he was "responsible for ensuring an equitable work environment." The memos to Mr. Lewis' and Mr. Spence's files also allude to evidence indicating that they had intimidated and teased Ms. Robertson and that such alleged behavior was unacceptable and unprofessional. The memos state that Mr. Lewis and Mr. Spence denied that they had acted inappropriately toward Ms. Robertson. Notwithstanding the personnel file memos, Union Camp maintained that the evidence against those employees did not constitute conclusive proof of sexual harassment, and denied any liability under Title VII.

Providing further evidence that the controversy surrounding Ms. Robertson's claim of sexual harassment was far from resolved, Assistant Chief Wendelken and Mr. Lewis wrote "rebuttal" letters to Ms. Morgan in response to the personnel file memos. In fact, Mr. Lewis advised Ms. Morgan that "a more intense and thorough investigation into this matter would prove [his version] to be factual." (Lewis Dep.Ex. at 2). Similarly, Assistant Chief Wendelken stated "I think a more intense investigation should have been made." (Wendelken Dep.Ex. 8 at 1).

The letters informed Ms. Morgan of Mr. Wendelken's and Mr. Lewis' beliefs that they were wrongly reprimanded, and complained of preferential treatment they perceived was afforded to Ms. Robertson. Mr. Lewis wrote that he was the victim of reverse discrimination insofar as Ms. Robertson was paid a higher wage than he. Mr. Lewis acknowledged the unpleasant work environment at the department, but blamed Ms. Robertson

---

**6.** Apparently, it was common for the firefighters to take naps during the lunch break. (Pl.['s] Ex. D(3)).

for the working conditions. Mr. Lewis also suggested that Union Camp hired Ms. Robertson as a firefighter not because she was qualified, but because she was a woman, and cited Ms. Robertson's higher pay and unidentified "special privileges" as evidence of that fact. (Lewis Dep.Ex.). Assistant Chief Wendelken similarly expressed anger over Ms. Robertson's "trumped up harassment charge" and doubt that he could perform his job with her in the department and the issues unresolved. (Wendelken Dep.Ex. 8 at 2–3).

Ms. Robertson returned to Ms. Morgan on several occasions during this period to advise Ms. Morgan about ongoing problems Ms. Robertson was having in the work place, including an incident with Assistant Chief Wendelken on March 7, 1994, the details of which are fuzzy, which caused Ms. Robertson to leave the workplace in tears. Ms. Morgan took no action.

Alan Kahn, Ms. Robertson's therapist with the EAP program, noted that, beginning in March, 1994, Ms. Robertson's mental health suffered a gradual but definite deterioration. Ms. Morgan, Mr. Lewis and Mr. Spence also observed this deterioration, noting that Ms. Robertson was particularly emotional and sensitive during her last couple of months on the job.

Beginning in March 1994, Ms. Robertson frequently missed work. Prior to March 1994, Ms. Robertson had neither complained nor displayed symptoms of psychological distress to the Union Camp physician, Robert Balsley, M.D. Ms. Robertson's personal physician, Fenwick T. Nichols, Jr., M.D., similarly observed that Ms. Robertson had not experienced problems prior to this period. It was Dr. Nichols' opinion that the 1994 deterioration occurred as a result of the workplace conditions at the Union Camp fire department. (Pl.['s] Ex. M).

On March 7, 1994, Ms. Robertson saw Dr. Balsley. She was upset and crying because, she stated, she was under a lot of stress and duress from her co-workers. Dr. Balsley talked to Ms. Morgan later that day about Ms. Robertson and her situation.

Ms. Robertson's condition did not improve, and on March 14 and 16, 1994, Ms. Robertson again visited Dr. Balsley regarding her distress allegedly caused by her co-workers. In those visits and subsequent ones, it did not appear to Dr. Balsley that Ms. Robertson was trying to avoid work or was a malingerer.

On May 2, 1994, Ms. Robertson left the workplace on long-term disability leave for emotional and psychological problems. The EEOC asserts that the pervasive harassment and discrimination within the fire station rendered her unable to work effectively in her position, and caused her to suffer a nervous breakdown. Ms. Robertson currently remains on long term disability leave from Union Camp.

Following Ms. Robertson's departure from the fire department, an unidentified co-worker placed an "abandoned" sticker on Ms. Robertson's locker and an "ex-fireman" sticker on her fire hat.

## DISCUSSION

### I. When Summary Judgment Is Appropriate

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *See Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992). This Court must avoid weighing conflicting evidence during this endeavor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted). However, if the evidence is merely colorable or not significantly probative, summary judgment may be granted. *See id.*

Courts in this jurisdiction adhere to the principle that employment discrimination cases should be disposed of at summary judgment only with "extreme caution." *See Beard v. Annis*, 730 F.2d 741, 743 (11th Cir.1984); *Hodges v. Stone Savannah River*

*Pulp & Paper Corp.,* 892 F.Supp. 1571, 1576 (S.D.Ga.1995).

## II. Title VII Framework

The EEOC brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended. Title VII provides in relevant part that it is unlawful for an employer:

> (1) to ... discriminate against any individual with respect to ... terms, conditions, or privileges of employment, *because of* [her] race, color, religion, *sex,* or national origin; or
>
> (2) to *limit, segregate, or classify* ... employees ... in any way which would ... tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee, *because of* [her] race, color, religion, *sex,* or national origin.

42 U.S.C. § 2000e–2(a) (emphasis added). Title VII was enacted to prevent employment discrimination, achieve equal employment opportunity in the future, and to make victims of employment discrimination whole. *See Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, (11th Cir.1986).

Title VII does not require, however, that employers fancy every employee's whim. It requires only that employers do not treat their employees differently based on immutable characteristics such as gender. Title VII plaintiffs *too often* overlook the fact that "employers [are not] require[d] to treat their employees with fairness or kindness," but only to refrain from engaging in statutorily proscribed discrimination. *Mayberry v. Endocrinology–Diabetes Assocs.,* 926 F.Supp. 1315, 1324 (M.D.Tenn.1996). This Court, it must be remembered, "do[es] not sit as a super-personnel department that re-examines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (internal quotes omitted).

Plaintiffs can claim sexual discrimination in a variety of ways, including a hostile workplace, disparate treatment, and retaliatory discharge. The EEOC attempts to show all three in the instant case.

## III. Union Camp Is Not Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claim

### A. The EEOC's Allegations of 1993 Harassment are Timely

Union Camp first argues that the EEOC's allegations of sex harassment based on acts occurring prior to September 3, 1993 are untimely and should not be heard by this Court. A filing of a timely charge of discrimination with the EEOC is a prerequisite to a Title VII action. 42 U.S.C. § 2000e–5(e)(1); *Delaware State College v. Ricks,* 449 U.S. 250, 256, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In order for a charge to be timely, it must be filed "within one hundred and eighty days after the alleged unlawful employment practice occurred...." 42 U.S.C. § 2000e–5(e)(1). Union Camp contends that because Ms. Robertson filed her Charge with the EEOC on March 2, 1994, the EEOC's claims of discrimination are timely only as to the events either alleged to have occurred within 180 days prior to March 2, 1994, or those events specifically alleged in Ms. Robertson's Charge or in the Complaint. Union Camp asserts that the Charge and the Complaint expressly limit the Title VII claims to events occurring in 1994, and, thus, at most, the 180 day filing requirement prevents the EEOC from seeking to impose liability for events occurring before September 3, 1993.

Under the "continuing violation" doctrine, however, an employer who has committed a series of discrete acts which amount to a practice of discrimination cannot rely on the 180 day filing requirement to bar an employee's suit unless the employee has waited more than 180 days from the last occurrence of one of the discrete acts. *See Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir.1992); *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 799–800 (11th Cir.1988), *modified on other grounds,* 850 F.2d 1549 (11th Cir.1988). The continuing violation doctrine is particularly applicable to hostile work environment claims because such claims are supported by Plaintiff establishing an ongoing pattern of offensive conduct. *Accord Morrow v. Auburn University at Montgomery,* 973 F.Supp. 1392, 1401 (M.D.Ala.1997) In this regard, the

Court is unpersuaded by the case law relied upon by Union Camp which addresses the continuing violation theory in the context of disparate treatment or retaliation claims. *See, e.g., Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1570 (11th Cir.1987) (rejecting a plaintiff's assertion of a continuing violation in the context of a denial of promotion claim).

Plaintiff's Complaint alleges that "[s]ince at least February 18, 1994," Ms. Robertson was subject to a hostile workplace. (Compl. at ¶ 7). Under a liberal pleading standard, this paragraph alone is sufficient to alert Union Camp to allegations of conduct occurring prior to February 17, 1994. When the EEOC Charge and letter determination, identified on a document list filed with the Complaint, are read as a part of the Complaint,[7] the continuing violation is clear. Although Ms. Robertson's Charge is not the picture of precision, the box labeled "continuing action" is clearly parked with an "X". (Pl.['s] Ex. A). In its determination letter, the EEOC's alleges that members of the fire department staff subjected Ms. Robertson to intimidation, harassment, humiliation and a hostile work environment based on her sex. (Pl.['s] 2d. Resp. to Def.['s] Mot.Summ.J., Ex. C). That letter does not limit its allegations to a particular period. If these allegations state a claim of sexual harassment it is because of the pattern and continuing nature of the complained of conduct. *Accord Morrow,* 973 F.Supp. at 1402. There is a sufficient nexus between the acts so as to survive summary judgment. *See Roberts,* 835 F.2d at 800.

Moreover, Union Camp cannot claim that it had insufficient notice or was unfairly surprised by the EEOC's pursuit of a claim for conduct occurring in 1993. *See EEOC v. Jacksonville Shipyards, Inc.,* 696 F.Supp. 1438, 1444 (M.D.Fla.1988); *Cruz v. Ecolab Pest Elimination Div., Ecolab, Inc.,* 817 F.Supp. 388, 391–92 (S.D.N.Y.1993). Again, the EEOC Charge, letter determination and Complaint provide Union Camp with notice that the EEOC was pursuing a hostile workplace claim. Discovery thoroughly covered events occurring during 1993. Union Camp's own investigation of Ms. Robertson's complaints to Ms. Morgan extended to misconduct occurring prior to 1994.

Accordingly, the EEOC's sexual harassment claim should not be limited to conduct that occurred within 180 days of Ms. Robertson's filing of the EEOC charge. Union Camp's attempt to limit the EEOC's claim to conduct that occurred after September 3, 1993 is without merit.

*B. The Events Alleged by Plaintiff Constitute Actionable Sexual Harassment*

■ The EEOC seeks to recover under the hostile work environment theory of sexual harassment. Under this theory, an employer faces liability when the work place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter conditions of employment and create and abusive work environment. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Applying this standard, it is clear to this Court that there is a genuine dispute of material fact as to whether Ms. Robertson was harassed in the workplace.

■ In order to establish a claim of hostile work environment sexual harassment, the EEOC must show (1) that Ms. Robertson is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment complained of was based upon sex; (4) that the harassment affected a term, condition or privilege of her employment; and (5) that the employer knew or should have known about the harassment and failed to take remedial action. *Munn v. Mayor & Aldermen of Savannah, Georgia,* 906 F.Supp. 1577, 1583 (S.D.Ga.1995) (citing cases). Union Camp challenges the last four elements of the EEOC's claim.

*1. Unwelcome Harassment*

To establish a hostile workplace claim, the EEOC necessarily must show that Ms. Robertson was subjected to unwelcome sexual harassment. Union Camp argues that the EEOC has failed to meet this burden because the incidents which the EEOC alleges

---

**7.** *See Coon,* 829 F.2d at 1567.

occurred were not explicitly sexual in nature. Although this non-explicit type of harassment has not been extensively litigated in the Eleventh Circuit, courts in the Southern District of Georgia consistently have defined hostile environment harassment broadly. *See, e.g., Mills v. Amoco Performance Products, Inc.,* 872 F.Supp. 975, 987 (S.D.Ga.1994) ("Hostile environment sexual harassment entails a pattern of conduct in the workplace that unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment.").

■ Courts in other jurisdictions that have addressed this issue have not required explicit sexual overtones. *See, e.g., Doe v. City of Belleville,* 119 F.3d 563, 575 (7th Cir.1997) ("[H]arassment lacking in sexual overtones may nonetheless support a claim for sex discrimination when it is visited upon worker of one gender and not the other."); *Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1194 (D.Kan.1995) ("Conduct complained of need not be clearly sexual in nature to be relevant to a charge of hostile environment sexual harassment."); *accord Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1377 (8th Cir.1996). In hostile work environment claims based on race, it has long been the rule that the harassment need not be explicitly racial in nature. Similarly, the Court concludes that Title VII does not require that the harassment be explicitly sexual in nature, or have explicit sexual overtones. This is true because "Congress intended to define discrimination in the broadest possible terms, so it did not enumerate specific discriminatory practices nor elucidate the parameter of such nefarious activities. . . ." *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1377 (8th Cir.1996). The critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring).

### 2. Based on Sex

The above discussion flows directly into the next element of the EEOC's claim. Union Camp argues that the EEOC cannot prevail because it cannot prove that the harassment encountered by Ms. Robertson was based on sex. The Eleventh Circuit requires a showing that "but for the fact of her sex, [the victim] would not have been the object of harassment." *See Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982); *accord Cummings v. Walsh Construction Co.,* 561 F.Supp. 872, 877 (S.D.Ga.1983). This Court is persuaded that the EEOC has submitted sufficient evidence that Ms. Robertson would not have been harassed but for the fact that she is a woman for the issue of causation to go to a jury in this action.

Union Camp's central argument is that others in the department were subject to pranks, and thus, both male and female employees were treated equally. It is true that where unwelcome harassment is "directed to both sexes and is equally offensive, the conduct cannot be said to be based on gender." *Cummings,* 561 F.Supp. at 877. The Record reveals, however, that the harassment in this case was not directed at both sexes equally and was not equally offensive.

Although there is evidence that isolated practical jokes were played on one or two other employees at the fire department, including Chief Hennie, the harassment experienced by Ms. Robertson went far beyond an occasional prank. The EEOC has submitted evidence sufficient for a jury to conclude that Ms. Robertson was teased, intimidated and isolated on a regular basis in a workplace dominated entirely by members of another gender. She had stickers placed on her locker and other equipment suggesting that she was inferior, she was given faulty equipment with which to work, she was picked at during her lunch break, and she was even locked out of the locker/shower/bathroom facility. Chief Wendelken's interrogation of Ms. Robertson and demands that she articulate the offensive and arousing nature of the swimsuit calendars reveals a further lack of respect for Ms. Robertson as the sole female member of the department.

Moreover, the affidavits of her co-workers provide evidence that the "picking at" of Ms. Robertson was more than merely innocent, harmless horseplay. More than one co-worker expressed his opinion based on his

---

**1375**

experience in the department that Ms. Robertson was the victim of incidents of teasing and intimidation because she is a woman. More than one co-worker confessed that he would not like to have been treated the way Ms. Robertson was treated. Finally, there is evidence that Assistant Chief Wendelken was more critical of her performance and that Chief Hennie did not want her in the all-male department.

All of this evidence buttresses Ms. Robertson's subjective belief that she was the victim of harassment based on her sex. Taken as a whole, the allegations provide support for a jury conclusion that Ms. Robertson's harassers "did not treat male employees in a similar fashion." *Henson,* 682 F.2d at 903; *accord McCoy v. Johnson Controls World Svcs., Inc.,* 878 F.Supp. 229, 232 (S.D.Ga. 1995). The evidence suggests differential treatment of men and women, and an animus toward Ms. Robertson's gender.

The Court does not agree with Union Camp's contention that the EEOC "now appears to assert that every exchange Robertson had with a male co-worker, after which Robertson was unhappy in any way, constituted 'sexual harassment' or gender-based harassment of some kind." (Def.Mot.Summ.J. at 5). To be sure, disputes and unpleasantness between employees of the opposite sex, even where they involve vulgarities and sexual comments, do not necessarily give rise to a Title VII violation. *See Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430–31 (7th Cir.1995). This is true because "the law obviously cannot require a company to insure that its employees will be liked by their peers." *Reed v. Delta Air Lines, Inc.,* 19 F.3d 19, 1994 WL 56930, at *4 (6th Cir.1994) (text in Westlaw).

Courts long have made clear, however, that where a work environment is dominated by members of one gender and the workplace environment is hostile to the other gender by treating that other gender as inferior, Title VII affords protection. *See Fredette v. BVP Management Associates,* 112 F.3d 1503, 1509 & n. 15 (11th Cir.1997) (noting that courts have long supported claims under Title VII where the work environment is dominated by a gender opposite of that of the victim, but holding same-sex harassment may also present a legitimate claim). The

EEOC has alleged numerous facts from which a jury could find that the Union Camp fire department offered such an anti-female hostile work environment.

3. *Affecting a Term or Condition of Employment*

Union Camp argues that the EEOC cannot prove that Ms. Robertson's work environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Although no tangible psychological injury to the victim is required under the *Harris* standard, there is little doubt that Ms. Robertson suffered such trauma here. She left the workplace on long-term disability due to the stress caused by her work environment—she subjectively perceived the environment as abusive.

The EEOC cannot recover based on Ms. Robertson's subjective belief alone, however; rather, the EEOC also must demonstrate that Ms. Robertson's reaction to the workplace hostility was objectively reasonable. *See Harris,* 510 U.S. at 22, 114 S.Ct. 367. The EEOC has made a sufficient showing here. The EEOC has provided the Court with evidence that, on a regular, or even daily basis, Ms. Robertson was subjected to harassment in the form of intimidation, teasing and isolation. Such harassment allegedly occurred when Ms. Robertson received and performed job assignments, when she took her lunch and other breaks, and even when she attempted to utilize the locker/shower/bathroom facilities. The Court is persuaded that an objectively reasonable person could perceive the environment as hostile. There is sufficient evidence for a conclusion that the conduct was frequent, humiliating and unreasonably interfered with Ms. Robertson's work performance. *Accord Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Statements by Ms. Robertson's co-workers further buttress a conclusion that the terms and conditions of Ms. Robertson's employment were altered. Had the harassment of Ms. Robertson not been severe and pervasive, the Court doubts that the shift firefight-

ers, who worked a different schedule from the day shift staff, would have been aware of the hostility. Providing further corroboration is Union Camp's decision to place memos, albeit ambivalently worded, in the personnel files of Assistant Chief Wendelken, Mr. Lewis and Mr. Spence regarding their conduct toward Ms. Robertson.

Union Camp relies on *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1995), as support for the proposition that the alleged harassment at issue here was not sufficiently pervasive or severe to add up to a viable sexual harassment claim. In *Baskerville*, a female secretary brought a Title VII action against her employer alleging harassment including, *inter alia*, episodes in which a manager referred to the secretary regularly as "pretty girl" and requested that "all pretty girls run around naked," made grunting "um, um, um" noises at the secretary, and alluded to his practice of masturbation. 50 F.3d at 430. The Seventh Circuit held that such conduct was not so severe and pervasive as to constitute sexual harassment, overturning a jury award of damages to the secretary. In so doing, the court concluded that at least some of the alleged incidents contained "the sexual charge of an Abbott and Costello movie[,]" reasoning that although "[i]t is no doubt distasteful to a sensitive woman to have such a silly man as one's boss, . . . only a woman with Victorian delicacy—a woman mysteriously aloof from contemporary American popular culture . . . would find [the manager's] patter . . . distressing." *Id.* at 431.

Union Camp argues that, consistent with *Baskerville*, "the antics at Union Camp's Fire Department . . . only give rise to an episode of 'Our Gang,' without Alfalfa to spice things up." (Pl.['s] Br. Supp.Mot.Summ.J. at 13). Without passing on the wisdom of the *Baskerville* court's reasoning[8] or it's analogy,[9] or the judgment

of Union Camp's counsel in relying on that reasoning and embellishing the analogy,[10] this Court concludes, consistent with the courts in the Southern District of Georgia, that even if there arguably remains a doubt that the misconduct at the fire department was sufficiently severe or pervasive, the benefit of that doubt should go to Ms. Robertson for purposes of this summary judgment motion. *Accord Quarles,* 949 F.Supp. at 851 (giving the benefit of the doubt as to this element to the plaintiff) (citing *Harris* and *Meritor*). Such deference is necessary because courts in this District find sexual harassment "intolerable in any situation, but especially within the workplace." *Dees v. Johnson Controls World Svcs., Inc.,* 938 F.Supp. 861, 865 (S.D.Ga.1996); *accord Quarles,* 949 F.Supp. at 850; *Hodges v. Stone Savannah River Pulp Paper Corp.,* 892 F.Supp. 1571, 1576 (S.D.Ga.1995).

### 4. Employer Responsibility

Union Camp asserts that the EEOC cannot prove the final element of its case that Union Camp knew or should have known of the harassment and failed to take prompt and appropriate remedial action. The Court disagrees.

As early as March 1993, Ms. Robertson began complaining to Ms. Morgan regarding problems she was experiencing in the workplace. Union Camp took no action with regard to these early signs of harassment, other than to suggest use of an alternate locker facility, and to refer Ms. Morgan to EAP. Even if Ms. Robertson's complaints were coupled with insecurities regarding her ability to perform her job or other, unrelated complaints, the Court finds that there is sufficient evidence from which a jury could conclude that Union Camp knew or should have known of the alleged harassment as early as

---

**8.** This Court does not consider itself to be "mysteriously aloof from contemporary American popular culture," sex-saturated or otherwise, or possessing only "Victorian delicacy," yet it finds the conduct alleged in *Baskerville* to be patently offensive, particularly in the workplace, and particularly emanating from a supervisor.

**9.** This Court cannot recall a single Abbott and Costello movie containing behavior similar to that alleged in *Baskerville*.

**10.** While the Court's knowledge of "Our Gang" is more limited, the Court finds no comedy in the EEOC's allegation that Ms. Robertson was repeatedly teased and isolated in the workplace to the point that she suffered an emotional breakdown, whether or not Alfalfa was present to spice things up.

March of 1993. Moreover, in her March 10 referral phone call to Vivian Hathaway at EAP, Ms. Morgan advised Ms. Hathaway that Ms. Robertson was feeling harassed and vulnerable as a woman in the workplace. In subsequent conversations, Ms. Hathaway informed Ms. Morgan that the male firefighters were making the work environment difficult for Ms. Robertson and detailed Ms. Robertson's complaints. Ms. Morgan's solution was to suggest that Ms. Robertson transfer back to the security department. Furthermore, even if there is a dispute as to whether Union Camp was alerted expressly to Ms. Robertson's complaints, that the hostility toward Ms. Robertson was pervasive enough to be known to the shift firefighters, whose work schedules did not frequently overlap with the day firefighters, suggests to this Court that Union Camp management should have been aware of the harassment.

With regard to Ms. Robertson's February 1994 complaint, Union Camp took the following remedial actions. Assistant Chief Wendelken removed the swimsuit calendars. Ms. Morgan interviewed the fire department staff regarding the calendar incident and investigation. Ms. Morgan distributed literature regarding sexual harassment and appropriate workplace conduct, and held a meeting or two with the department employees. Finally, following Ms. Robertson's filing of the EEOC Charge, Ms. Morgan put memos regarding the unprofessional conduct in Mr. Lewis', Mr. Spence's and Assistant Chief Wendelken's personnel files. Thus, it cannot be said that Union Camp did nothing.

This Court is not persuaded, however, that Union Camp's response was reasonably calculated to end the alleged harassment faced by Ms. Robertson. *See Munn,* 906 F.Supp. at 1583 (holding that appropriateness of remedial action taken by employer is valid consideration in evaluating a sexual harassment claim). Ms. Morgan's investigation notes reveal mistreatment of Ms. Robertson that goes far beyond swimsuit calendars in the locker room. Moreover, several co-workers had observed Assistant Chief Wendelken condoning and, indeed, inciting Mr. Lewis' and Mr. Spence's harassment of Ms. Robertson. Ms. Morgan herself noted in the personnel file memos that there was evidence to support these allegations, although she appears to have rejected its validity. Mr. Wendelken remained as Ms. Robertson's supervisor. Furthermore, the personnel file memos were written only after Ms. Robertson filed a charge with the EEOC. Their vague wording does not suggest resolution of Ms. Robertson's complaints. The rebuttal letters written by Assistant Chief Wendelken and Mr. Lewis should have triggered alarm bells at Union Camp that the workplace tensions were far from resolved. At the very least, further investigation of the conflict was warranted. In fact, both men urged Ms. Morgan to conduct a more detailed investigation. Assistant Chief Wendelken expressed his belief that he would have difficulty performing his job with Ms. Robertson present and the issues unresolved. Union Camp failed to recognize the signals that the conflict was not ameliorated, however, and Ms. Robertson was thrown right back into the fire, so to speak, to be faced with the same (or worse) hostile environment that she had been fighting prior to Union Camp's "remedies."

The cursory actions taken by Union Camp can be contrasted with the more thorough actions taken in case law in which courts in this District have concluded that an employer's response to a complaint of harassment was appropriate. *See, e.g., Clark v. Johnson Controls World Svcs., Inc.,* 939 F.Supp. 884, 890 (S.D.Ga.1996) (employer suspended supervisor pending investigation); *Dees,* 938 F.Supp. at 867 (employer conducted thorough investigation within a reasonable time, interviewed the alleged victim in detail offsite, issued formal reprimands, placed one employee on probation and fired two others).

Thus, while it is true that courts should not sit as super-personnel departments and second guess the wisdom of an employer's management decisions, it is clear that in this case a genuine dispute of material fact exists as to whether Union Camp's efforts regarding the 1994 complaint were reasonably calculated to end the harassment faced by Ms. Robertson. *Accord Munn,* 906 F.Supp. at 1583.

In sum, while the Court expresses no opinion as to whether the evidence mandates a conclusion that a hostile environment existed at the Union Camp fire department so as to invoke the protections of Title VII, the Court

holds that the evidence is more than sufficient to create a genuine issue of material fact precluding summary judgment. *Accord Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647–48 (11th Cir.1997).

### IV. Union Camp Is Entitled to Summary Judgment on Plaintiff's Disparate Treatment Claim

■■■ Union Camp argues that the EEOC cannot prevail in its disparate treatment claim because it cannot show that Ms. Robertson was treated less favorably than her male counterparts because of her sex. The Court agrees.

■■■ Disparate treatment can be proved with direct or indirect evidence. *See Meeks v. Computer Assoc., Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994). The EEOC concedes that this is an indirect evidence case. (Pl.['s] 2d. Resp. to Def.['s] Mot.Summ.J. at 8). An indirect evidence case involves a three-tiered analysis. Tier one requires the EEOC to establish a prima facie case by a preponderance of the evidence that (1) Ms. Robertson was indeed female; (2) she was qualified; (3) despite her qualifications she suffered an adverse employment action; and (4) a similarly situated male did not. *See Hodges*, 892 F.Supp. at 1578 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Once the EEOC has successfully made a prima facie showing, tier two shifts the burden of production to Union Camp to articulate, not prove, a legitimate, non-discriminatory reason for the treatment alleged. *See Hodges*, 892 F.Supp. at 1577 (citing *McDonnell Douglas*). Union Camp's burden in this regard is exceedingly light. *See Quarles*, 949 F.Supp. at 853 (citing *Meeks*). Should Union Camp carry this burden, the EEOC has the oppor-

tunity at tier three to demonstrate by a preponderance of the evidence that the reasons proffered by Union Camp are not true reasons, but merely pretext for discrimination. *See Hodges*, 892 F.Supp. at 1577–78. Despite the shifting burdens of proof, the ultimate burden of persuasion remains at all times with the EEOC. *See id.* (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### A. Mr. Lewis and Ms. Robertson Received Equal Overtime and Training Opportunities

The EEOC contends that Ms. Robertson was treated less favorably than her male co-workers, and specifically Mr. Lewis, in that she received fewer overtime opportunities, and that there was a difference in training given to Ms. Robertson and Mr. Lewis. Assuming without deciding that the EEOC has established the first three prongs of a prima facie case with its assertions,[11] Union Camp has submitted hard evidence in the form of overtime and training records which show that Ms. Robertson was not treated less favorably than Mr. Lewis. Thus, the EEOC's claim of disparate treatment must fail on prong four.

During 1994, Ms. Robertson was absent frequently in the few months in which she worked, thus missing out on overtime and training opportunities. During 1993, Ms. Robertson was *offered* one-half hour more overtime than Mr. Lewis. Ms. Robertson actually worked twelve fewer overtime hours than Mr. Lewis because she declined approximately fifteen of the hours offered. With regard to 1992, Union Camp has submitted records establishing that Ms. Robertson's

---

11. In its motion for summary judgment, Union Camp argues that the EEOC cannot make out prong three of its prima facie case because the loss of overtime and training opportunities alleged here do not constitute adverse employment actions as a matter of law. The Fifth Circuit has held that actions that at most "restricted promotional opportunities" at some indeterminate point in the future do not constitute adverse employment actions in the disparate treatment or retaliation context. *See Dollis v. Rubin*, 77 F.3d 777, 779–82 (5th Cir.1995); *accord Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.

1997) (holding that Title VII was designed to address only "ultimate" employment decisions such as hiring, granting leave, firing, promoting and compensating), *cert. denied,* — U.S. —, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). The Eleventh Circuit has not yet addressed whether an employer's denial of "intermediate" opportunities for advancement, as distinguished from an outright denial of a promotion, constitutes an adverse employment action. Because this Court determines that the EEOC's disparate treatment claim fails on other grounds, it declines to adopt the "ultimate" adverse employment decision case law at this time.

fewer overtime hours worked were due to periods of sick leave and light duty, and her ineligibility for overtime due to her having worked fewer than 40 hours in certain weeks. Union Camp submitted further records revealing that Mr. Lewis and Ms. Robertson both received 135 hours of formal training and testing during the nearly two-year period in which they both were employed at the fire department. Aside from Ms. Robertson's statements of her belief that Mr. Lewis was favored or that Assistant Chief Wendelken failed to follow proper overtime procedures, the EEOC has not submitted any evidence contradicting Union Camp's overtime and training records. Thus, insofar as the EEOC claims disparate treatment in overtime and training opportunities, that claim must fail.

### B. Alleged Differing Job Assignments Were Not Pretext

With regard to job assignments, the EEOC alleges that Ms. Robertson was denied equal opportunity and that such denials of opportunity hindered her progress on a promotion track to shift firefighter. The EEOC contends that Mr. Lewis was given the choice assignments instead of Ms. Robertson even though Ms. Robertson was the more senior employee. The evidence available to the Court casts doubt on whether Union Camp did in fact favor Mr. Lewis.[12] Nonetheless, giving Plaintiff the benefit of the doubt as to whether Mr. Lewis was so favored, Union Camp counters that Mr. Lewis had superior qualifications and performance evaluations such that a decision to favor him was not pretext. The position of shift firefighter has not been vacant at any time relevant to this action.

The Court recognizes there is some evidence that Assistant Chief Wendelken "gave Therese some of the worst jobs to perform". (Pl.['s] Ex. D(4)). Mr. Lewis himself admitted to Ms. Morgan that he performed "important work" while Ms. Robertson "gets to

file stuff." (Morgan I Dep.Ex. 19(e)). The Court concludes, however, that the EEOC has failed to carry its burden of persuasion that Union Camp's proffered reasons were indeed pretext when it allegedly denied Ms. Robertson job assignments.

Mr. Lewis had shown an aggressive interest in shift work from the start of his employment at the fire department whereas Ms. Robertson's interest developed at a later time and appears to have been inconsistent. While there may be some disagreement regarding Ms. Robertson's desire to become a shift firefighter, other evidence further suggests that Union Camp did not favor Mr. Lewis out of any discriminatory motive. First, Ms. Robertson was paid more than both Mr. Lewis and Mr. Spence. While not dispositive of the Court's decision here, the greater pay gives rise to an inference that Ms. Robertson was not discriminated against. Cf. Proud v. Stone, 945 F.2d 796, 797–98 (4th Cir.1991) (in age discrimination case, holding that the fact that the supervisor who fired the victim was the same individual who hired him six months earlier with full knowledge of his age gave rise to a "strong" and "compelling" inference that discrimination was not the determining factor for the supervisor's decision). Similar to Proud, it does not make sense that Union Camp would pay a higher wage to a worker it dislikes.

Second, although Ms. Robertson had six months greater seniority within the department, Mr. Lewis received stronger performance evaluations and had substantially more practical firefighting experience acquired during his 10 years of volunteer service. Although the EEOC has submitted evidence sufficient to show that Ms. Robertson experienced a hostile work environment, such hostility does not persuade this Court that Union Camp's job assignment decisions were a pretext for discrimination for purposes of the disparate treatment claim.

---

12. Ms. Robertson has stated that Mr. Lewis received job assignments that enhanced his skills, as well as jobs involving less climbing or walking than those assigned to her. Union Camp denies these allegations. It appears from the work logs submitted by Union Camp that both Mr. Lewis and Ms. Robertson received varied job assignments. It would be difficult to predict the train-

ing opportunities provided by those tasks or the length of time required to complete them. With regard to the increased walking or climbing in jobs assigned to Ms. Robertson, Assistant Chief Wendelken has denied that he has any idea when he assigns a job how much walking or climbing it will entail.

In sum, the EEOC has failed to persuade the Court that Union Camp favored Mr. Lewis in overtime and training opportunities. With regard to the remaining allegation of less favorable job assignments, although there may be a dispute as to whether Mr. Lewis did indeed receive favorable treatment, Union Camp has succeeded in offering legitimate justifications for any alleged favoritism. The EEOC has not met its overall burden of persuasion that Union Camp's motives were discriminatory. In reaching its conclusion, the Court reminds the EEOC that federal courts "do not sit as a superpersonnel department that reexamines an entity's business decisions." *Elrod,* 939 F.2d at 1470.

## V. Defendant Is Entitled to Summary Judgment on Plaintiff's Retaliation Claim

■ Union Camp argues that the EEOC has failed to make a case that Ms. Robertson was retaliated against for complaining about the alleged harassment and discrimination. The Court agrees.

To make out a prima facie case of retaliatory discharge, the EEOC must show by a preponderance of the evidence that (1) Ms. Robertson was engaged in a statutorily protected activity; (2) an adverse employment action occurred simultaneously with or subsequent to the protected activity; and (3) the adverse action was causally related to the plaintiff's protected activity. *See Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1074 (11th Cir.1995); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993). Union Camp concedes the first element of this test, but asserts that the EEOC cannot establish the remaining two prongs. Specifically, Union Camp argues that Ms. Robertson was not the subject of any adverse employment action by Union Camp at any time in which she was employed in the fire department.

To resolve this issue, the Court first looks to the conduct that the EEOC alleges constitutes retaliation. The EEOC contends that following her complaints to Ms. Morgan, Ms. Robertson was ostracized, her performance and break-time were monitored more closely or altered by Assistant Chief Wendelken, she was interrogated by Chief Hennie regarding her complaint about the swimsuit calendars, scolded by Assistant Chief Wendelken for taking too long a break on one occasion, and denied equal opportunities in overtime, training and job assignments. In view of the Court's decision that Ms. Robertson was not denied equal opportunity in overtime, training and job assignments, the Court will consider only the remaining assertions of retaliation.

As regarding the increased hostility and monitoring, the Court follows well-established employment discrimination case law which makes clear that Union Camp did not retaliate against Ms. Robertson in any legal sense triggering the protections of Title VII. In no case in this Circuit has the Court found an adverse employment action to encompass a situation where a supervisor has instructed employees to ignore an employee who engaged in protected activity. *See Clark,* 939 F.Supp. at 891 (holding allegations that supervisor stared at the plaintiff and that coworkers shunned her following her sexual harassment complaint were insufficient to meet the adverse employment action prong of plaintiff's retaliation claim), *aff'd,* 124 F.3d 222 (11th Cir.1997). Nor is there case law supporting a retaliation claim resulting from increased monitoring of an employee following his or her complaints.

■ The EEOC appears to contend that hostility toward and increased monitoring of Ms. Robertson following her complaints to Ms. Morgan caused her to suffer an emotional breakdown, and consequently leave her job. Thus, the adverse employment action suffered by Ms. Robertson consisted of a constructive discharge. The EEOC's theory is novel. The legal standard in this Circuit for a constructive discharge is whether or not the employer's action would make a reasonable person in the employee's position feel compelled to resign. *See Hodges,* 892 F.Supp. at 1581 (citing *Mitchell v. Humana Hospital–Shoals,* 942 F.2d 1581, 1583 (11th Cir.1991)). Viewing the allegations in the light most favorable to Ms. Robertson, this Court concludes that they are insufficient to create a genuine dispute of material fact in this case. *Accord Clark,* 939 F.Supp. at 891; *Munday v. Waste Mgmt. of North Am., Inc.,* 126 F.3d 239, 241 (4th Cir.1997) (holding that

supervisor's actions in yelling at plaintiff truck driver, directing other employees to ignore her and spy on her, and assigning her a route other than the one she requested, all resulting in her departure from the workplace on job stress-related disability leave, did not give rise to a constructive discharge retaliation claim). This Court's decision is necessary because, as noted earlier, "the law cannot require a company to insure that its employees will be liked by their peers." *Reed,* at 241.[13]

It is apparent that Assistant Chief Wendelken played a role in promoting hostility toward Ms. Robertson and that he more closely documented her activities following her complaints. It also seems that he scolded her on one occasion for taking a break equal in length to Mr. Lewis and Mr. Spence. The Court is also mindful of the statements by Ms. Robertson's co-workers alluding to the fact that Mr. Wendelken had a vindictive personality. Absent any allegation that Assistant Chief Wendelken disciplined or otherwise took an adverse action against Ms. Robertson as a result of her complaints, however, such hostility is more appropriately addressed in the context of the EEOC's hostile work environment claim. Similarly, the Court is not persuaded that the confrontation between Chief Hennie and Ms. Robertson regarding the swimsuit calendars constituted retaliation. There is no evidence that Ms. Robertson's employment status was altered, or that she ever received a reprimand on her record or was adversely reported to management as a result of the closer monitoring. At no point was Ms. Robertson's job in danger. While the EEOC has made a sufficient showing that Ms. Robertson worked in an abusive environment, and that the abuse continued after her complaints were filed, the remedy for that abuse, again, is through her hostile workplace harassment claim. The allegations that she was ignored and more closely monitored are part and parcel of that claim.

## CONCLUSION

As noted earlier, courts in the Southern District of Georgia dispose of employment discrimination claims at the summary judgment stage only with extreme caution. Exercising that caution, the Court concludes that there is a genuine dispute of material fact as to whether Ms. Robertson was sexually harassed in the workplace. Accordingly, the Court must **DENY** summary judgment as to that claim. Caution alone cannot save the EEOC's disparate treatment and retaliation claims, however. Thus, summary judgment is **GRANTED** as to those claims.

**13.** Because this Court can envision a situation in which an employer's post-complaint conduct (such as isolating, spying on, or monitoring an employee) so severely interferes with an employee's ability to perform his or her job that it alters the terms and conditions of employment, the Court declines to adopt a *per se* rule that only "ultimate" employment actions can constitute an adverse employment decision. *But cf. Mattern,* 104 F.3d at 707–08 (5th Cir.1997) (holding that "Title VII was designed to address ultimate employment decisions" such as hiring granting leave, firing, promoting, and compensating, "not to address every decision made by employer that arguably might have some tangential effect upon those ultimate decisions") (quoting *Dollis,* 77 F.3d at 781–82 and *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981)); *Reed,* at 241 (6th Cir.1994); *Wilson v. Southern Nat'l Bank,* 900 F.Supp. 803, 811 (W.D.N.C.1995), *aff'd,* 92 F.3d 1184, 1996 WL 445088 (4th Cir.1996).Rather, the Court agrees that Title VII should be read to encompass all personnel actions which alter the terms and conditions of employment, "not only those with an impact on the employee's permanent employment record." *Hayes v. Shalala,* 902 F.Supp. 259, 267 (D.D.C.1995); *accord Palmer v. Shultz,* 815 F.2d 84, 98 (D.C.Cir.1987).