939 F.2d 1466
 56 Fair Empl.Prac.Cas. 1246,
57 Empl. Prac. Dec. P 40,944, 60 USLW 2222
 James G. ELROD, Plaintiff-Appellee,
v.
SEARS, ROEBUCK AND COMPANY, a New York corporation,
Defendant-Appellant.
James G. ELROD, Plaintiff-Appellee, Cross-Appellant,
v.
SEARS, ROEBUCK AND CO., a New York corporation,
Defendant-Appellant, Cross-Appellee.
 Nos. 89-3563, 90-3416.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 30, 1991.
 
 Tracey I. Arpen, Jr., Marks, Gray, Conroy & Gibbs, P.A., Jacksonville, Fla., R. Lawrence Ashe, Jr., Paul, Hastings, Janofsky & Walker, Kelly J. Koelker, Atlanta, Ga., for defendant-appellant.
 Ann Elizabeth Reesman, McGuiness & Williams, Washington, D.C., for Equal Employment Advisory Council, amicus curiae.
 William G. Cooper, Coker, Myers, Schickel, Cooper & Sorenson, P.A., Jacksonville, Fla., David M. Lipman, Lipman & Weisberg, Miami, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Florida.
 Before FAY and DUBINA, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge:
 
 
 1
 Sears, Roebuck and Company ("Sears") claims it fired James Elrod ("Elrod") because Sears believed he had been guilty of sexual harassment of female employees in its Jacksonville Credit Central Office ("Jacksonville Office"). Elrod thought he was fired because of his age. We must decide whether Elrod presented sufficient evidence that Sears' asserted justification was pretextual. If not, Sears was entitled to judgment notwithstanding the jury's verdict in Elrod's favor. The District Court concluded the evidence supported the verdict and denied Sears' motion for JNOV. We now reverse.
 
 
 2
 Elrod became the manager of the Jacksonville Office in 1982. The Jacksonville office formed one portion of a larger Sears territory that was based in Atlanta (the "Atlanta Territory"). In February 1986, Frank Malone ("Malone"), the Atlanta Territorial Personnel Director, received an anonymous letter allegedly sent by an employee in the Jacksonville Office. The letter complained that Elrod had been humiliating and degrading female employees with vulgar and obscene conversations and gestures. Malone passed the letter on to Elrod's immediate supervisor, J.D. Merrill ("Merrill"), the Atlanta Territorial General Credit Manager. Merrill informed Elrod of the anonymous charges against him and then directed Dorothy Rives ("Rives"), Personnel Manager of the Jacksonville Office, to see if there was any merit to the allegations.
 
 
 3
 Rives then interviewed several employees in the Jacksonville Office--some were chosen randomly, some had volunteered to speak to Rives, and some were selected because the Rives investigation revealed that they might have witnessed or been the victim of harassment. Her questions of the interviewees were non-directive. For example, Rives did not ask if Elrod had been harassing employees but instead asked what the employee being interviewed thought of Elrod. After conducting her investigation, Rives reported to Merrill great concerns of sexual harassment in the Jacksonville Office. Her memorandum informed Merrill that she had interviewed a cross-section of employees almost all of whom had been a party to Elrod's numerous sexually related remarks.[1] Merrill and Malone then discussed Rives' findings and agreed that Elrod should publicly apologize to the employees in the Jacksonville Office and that Merrill should conduct a Deficiency Interview with Elrod. During this interview, Elrod signed without objection a Memorandum of Deficiency Interview that read:
 
 
 4
 Inquiries from credit central employees directed to the Territorial Office and to the Jacksonville Personnel Department in recent weeks indicated that a serious problem existed in the Jacksonville Credit Central.Extensive personal interviews with representative employees of the credit central confirmed the following:
 
 
 5
 Mr. Elrod has on occasion displayed extremely poor judgment and engaged in conduct which was very distasteful to female employees. His language has been described as vulgar and suggestive to the point of causing embarrassment and humiliation. Some of the employees have been made to feel that their jobs are threatened and many of them feel that Mr. Elrod seeks revenge against any employee who may have expressed concern about the current situation in the unit.
 
 
 6
 Mr. Elrod clearly understands that the unsatisfactory conduct in which he has engaged is a very serious violation of company policy and will not be tolerated. He agrees to conduct himself as a gentleman and to fulfill his management duties in complete conformance with company policy. He will make every effort to be sincerely courteous and friendly within the framework of his assignment as unit manager.
 
 
 7
 Mr. Elrod also understands that any future repetition of unsatisfactory behavior on his part will result in immediate termination.
 
 
 8
 But shortly after Elrod apologized to his employees, Merrill and Malone were again alerted to a problem in the Jacksonville Office. Rives phoned Merrill and Malone that one of the managers under Elrod had confirmed reports that Elrod was displaying a vindictive attitude to those employees who he believed had squealed on him. The manager had reported to Rives that Elrod had threatened to "get those bitches" and had even insinuated that there were certain women in the Jacksonville Office he would like to kill. Within three days of receiving this latest news, Merrill traveled to Jacksonville where he fired Elrod. Similar to the Deficiency Interview, Elrod did not object to the latest charges against him. Elrod was fifty-one years old when he was terminated.
 
 
 9
 At or about the time of Elrod's dismissal, Sears announced it was closing its Atlanta Territorial Office. The effect was to displace several hundred employees in Atlanta, most of whom were transferred to Sears' Headquarters in Chicago. But one manager who was younger than Elrod was transferred to Jacksonville where he became the new manager of the Jacksonville Credit Central Office.
 
 
 10
 Elrod filed this suit, claiming he was fired because of his age. The jury agreed and awarded back pay. The District Court denied Sears' motion for judgment notwithstanding the verdict and Sears appeals from the denial of that motion.
 
 ANALYSIS
 
 11
 We review the District Court's decision denying a motion for judgment notwithstanding the jury's verdict de novo. See Carter v. Miami, 870 F.2d 578, 581 (11th Cir.1989). We consider all the evidence, including that which favors the moving party, in the light most favorable to the nonmoving party. "If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict," then the motion must be granted. Id. And a jury question does not arise from a mere scintilla of evidence. Motions "for judgment notwithstanding the verdict need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question." Id.; see also Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493, 1494-95 (11th Cir.1987).
 
 
 12
 Elrod's suit claims that Sears' decision to fire him violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Sec. 621 et seq. His proof at trial relied upon the four-pronged test established for proving discrimination in Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This test has been modified for application in ADEA cases. See Carter, 870 F.2d at 581. In order to establish a prima facie case of age discrimination, Elrod must show that he is over the age of forty, that he was discharged, that he was qualified for the position from which he was discharged, and that a younger person replaced him. Id. at 582. Once Elrod has satisfied this burden, an inference of age discrimination is created that Sears can rebut by articulating a legitimate nondiscriminatory reason for Elrod's discharge. If Sears rebuts the inference, Elrod must present significant probative evidence that the articulated reason is merely a pretext for discrimination. Elrod can do this either by showing that Sears' proffered reason is unworthy of credence or by showing that age more than likely motivated Sears to fire him. Id. at 584.
 
 
 13
 Elrod has met his initial burden of establishing a prima facie case. Elrod was 51 years old when he was fired, his replacement was younger, and Elrod's 22 1/2 years of service coupled with his favorable employment reviews are sufficient evidence that he was qualified for the job to meet the first McDonnell Douglas hurdle. But Sears has articulated a legitimate nondiscriminatory reason for firing Elrod--that Sears believed he had been sexually harassing female employees. The burden then becomes Elrod's to show that this reason is pretextual.
 
 
 14
 We must make an important distinction before proceeding any further. Much of Elrod's proof at trial centered around whether Elrod was in fact guilty of the sexual harassment allegations leveled at him by his former co-workers. We can assume for purposes of this opinion that the complaining employees interviewed by Rives were lying through their teeth. The inquiry of the ADEA is limited to whether Rives, Malone and Merrill believed that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge.[2] See Hawkins v. Ceco Corp., 883 F.2d 977, 980 n. 2 (11th Cir.1989), cert. den., --- U.S. ----, 110 S.Ct. 2180, 109 L.Ed.2d 508 (1990) (That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.). Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted). "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory...." Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (emphasis in original). See also Jones, 874 F.2d at 1540; Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated Sec. 1981.").
 
 
 15
 Elrod has offered no evidence to show that Sears' justification is unworthy of credence. Certainly Sears is permitted to discipline an employee it believes to be guilty of sexual harassment. If Sears does nothing in the face of such a belief, Sears runs a serious risk of incurring Title VII liability to those employees harassed. See Steele, 867 F.2d at 1313 and 1316-17. That Rives conducted the interviews, believed the charges of harassment, and forwarded her report to Merrill and Malone are uncontroverted. When faced with the Memorandum of the Deficiency Interview, Elrod did not ask for any changes to be made. Instead, he signed without objection the paper that confirmed the harassment had taken place. And there is likewise no evidence to contradict that after the Deficiency Interview, employees complained to Rives that Elrod was displaying a vindictive attitude. When Merrill discharged him after hearing of these complaints, Elrod once again did not deny that he had continued to engage in unsatisfactory behavior. Cf. Jones, 874 F.2d at 1540 (Admission of misconduct by an employee at his disciplinary hearing shows the employer honestly believed the employee had committed the violation.). Elrod may have convinced the jury that the allegations against him were untrue, but he certainly did not present evidence that Sears' asserted belief in those allegations was unworthy of credence.[3]
 
 
 16
 Nor has Elrod offered any substantially probative evidence that age more likely than not motivated his discharge. Elrod faces a difficult burden here, because all of the primary players behind his termination--Rives, Malone and Merrill--were well over age forty and within the class of persons protected by the ADEA. These three are more likely to be the victims of age discrimination than its perpetrators. Elrod has attempted to carry this burden by pointing to the closing of the Territorial Office in Atlanta. He claims that this closing forced Sears to find credit central manager positions for those younger Atlanta employees who were on a "career path." For evidence that his termination was one segment of a larger pattern to discriminate, he looks to the Sears Credit Central Office in Tampa ("Tampa Office"). Around the same time as Elrod's discharge, Sears replaced an older manager of the Tampa Office with a younger person transferred from the closing Atlanta Territory Office. Sears passed over an allegedly more qualified and older Tampa employee in filling the Tampa Office position. Elrod argues that Sears was discriminating based on age in Tampa, and that this alleged discrimination shows a pattern of age discrimination on Sears' part in relocating Atlanta Territory employees.
 
 
 17
 But Elrod's proof falls far short of the mark. First, the older manager who was replaced in Tampa had received a lucrative promotion to a much larger credit central office. So there was only an opening to fill in Tampa because of Sears' favorable treatment of an older employee. Second, absolutely no evidence was admitted that indicates Sears chose the younger Atlanta employee over the older Tampa candidate based upon age. There is neither any direct evidence of age discrimination nor any indirect evidence, such as proof backing up the allegation that the older candidate was more qualified for the position. Finally, the closing of the Atlanta Territory affected hundreds of positions. Yet Elrod argues the placement of two managers in the Jacksonville and Tampa Offices is evidence of a grand scheme to discriminate. Elrod's proof of the Tampa incident boils down to one isolated case where Sears chose a younger employee for a manager's position. This is hardly sufficient to prove any pattern in the Atlanta Territory closing.
 
 
 18
 Elrod has offered no probative evidence to challenge Sears' claim that Elrod was fired because of charges of sexual harassment. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its action." Carter, 870 F.2d at 585 (citation omitted). Sears' proof of the anonymous letter, its investigation, the Deficiency Interview, and its notice of subsequent misconduct is uncontradicted. Because Elrod has presented insufficient evidence that the nondiscriminatory reason is unworthy of credence or that age more likely than not was a motivating factor, the jury's verdict cannot stand. The decision of the District Court is REVERSED. The award of attorney's fees and costs to Elrod is also REVERSED.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 The many remarks reported are far too numerous to detail here, but a small sampling will afford the reader a glimpse of the atmosphere reported in the Jacksonville Office. Elrod had volunteered to one female employee who wished to have children that he would act as a "stand in" for her husband if she wanted to become pregnant. Another female employee, after receiving assortments of red and yellow roses, was asked by Elrod which arrangement she received for the "better performance." Elrod was overheard speaking about another young female employee, "I bet she is good." Elrod commented to yet another employee about her new dress that she must have "gotten her a sugar daddy." The Rives investigation indicated that Elrod's antics apparently were not limited to off color remarks, however. He purportedly had once followed an employee for several paces while cupping his hands a few inches beneath her buttocks
 
 
 [2]
 Rives, Merrill and Malone were the only Sears employees acting within the scope of their actual or apparent authority who were primarily involved in Elrod's discharge. Sears can only be liable for a discriminatory motive harbored by one of these three agents. See Jones v. Gerwens, 874 F.2d 1534, 1541 and n. 13 (11th Cir.1989); Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 n. 1; (11th Cir.1989); Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1558-60 and n. 4-5 (11th Cir.1987); Lewis v. Federal Prison Indus., Inc., 786 F.2d 1537, 1543 n. 6 (11th Cir.1986)
 
 
 [3]
 Elrod claims that his favorable reviews through the years show lack of credence. But the fact that Elrod's supervisors had never observed him harassing female employees in the past is not evidence that Sears did not believe the current allegations of harassment that purportedly occurred when Elrod's supervisors were not around to see it. Elrod also points to an employee attitude survey that might be interpreted as indicating Elrod's employees had no morale problems while at work. But that dog won't hunt because Rives, Malone and Merrill had not seen the results of the employee attitude survey when Sears made the decision to fire him. If they were unaware of the results of the survey, the survey could not have alerted them that the findings of the Rives investigation were incorrect