[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12406
Non-Argument Calendar
_____

D.C. Docket No. 4:11-cv-00280-WTM-GRS


MARY S. USRY,

Plaintiff-Appellant,

versus

LIBERTY REGIONAL MEDICAL CENTER, INC.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(March 21, 2014)

Before TJOFLAT, HULL and JORDAN, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Mary Usry sued her former employer, Defendant-Appellee Liberty Regional Medical Center, Inc. ("LRMC"). Usry asserted that LRMC terminated her because of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a) ("ADEA"). The district court granted summary judgment in favor of Defendant LRMC, and Plaintiff Usry appealed. After careful review of the record and the parties' briefs, we affirm.

## I.  BACKGROUND

We start by reviewing the evidence in the light most favorable to Plaintiff Usry as the nonmoving party.

**A.    Usry's Employment**

 In 1999, Plaintiff Usry began working as a part-time paramedic for Defendant LRMC. Around 2002, she became a full-time paramedic. During her employment with LRMC, Usry acted in a professional manner and gave the best treatment she could possibly give to her patients.

In 2009, Plaintiff Usry was 61 years of age and the oldest paramedic working for LRMC. Co-workers referred to Usry as "grandma" frequently, which offended Usry. Usry asked co-workers to stop calling her "grandma," but they ostensibly did not.

In addition, Usry's supervisor, Robin Long, made comments such as Usry had been in emergency medical services ("EMS") "since horse and buggy

2

ambulances." Supervisor Long also denied Usry's requests for overtime work, and instead assigned the overtime shifts to four of Usry's younger colleagues. Notably, however, the evidence also indicated that three of those four younger colleagues were Emergency Medical Technicians ("EMTs") who worked the overtime shifts for an hourly rate significantly lower than Usry's rate as a paramedic. As a cost-saving measure, LRMC's management instructed supervisors to assign overtime shifts to the cheaper EMTs whenever possible.

However, one of Usry's younger colleagues who received overtime assignments was a paramedic. But this younger paramedic worked only at LRMC and did not hold jobs with other healthcare providers. By contrast, Usry also worked a considerable amount of hours for other healthcare providers.

## B.    Incident on October 31, 2009

Most of the evidence centered around an incident that occurred on Halloween night in 2009. Usry and two colleagues were called to Coastal Manor, a nursing home. Upon arrival, Usry spoke to a nurse who was concerned that a patient had suffered a stroke. The nurse told Usry that she had attempted to contact Dr. Sobowale, the patient's primary care physician, but to no avail. The nurse therefore called LRMC, Usry's employer, and talked to Dr. Snow, the medical control doctor on staff at LRMC that evening. Dr. Snow ordered that the

3

patient be transported to the emergency room, if Usry and her colleagues "thought that [the patient] . . . had a stroke."

While Usry was speaking with the Coastal Manor nurse, Usry's colleagues loaded the patient into the ambulance and performed an assessment. The colleagues reported to Usry that the patient's blood sugar was low. Usry contacted LRMC's emergency room and talked to Dr. Snow. According to Usry's version of the events, Usry reported her findings and Dr. Snow told Usry that it sounded like the patient had low blood sugar. According to Usry, Dr. Snow then instructed Usry to take the patient back to the Coastal Manor nursing home, even though Usry and her colleagues had already driven about "a mile or two" towards the LRMC emergency room. Dr. Snow asked Usry to tell the Coastal Manor nurses that they should (1) check the patient's blood sugar, (2) make sure the patient eats, and (3) call back Dr. Snow if there were any changes.

Consistent with Dr. Snow's instructions, Usry and her colleagues returned the patient back to the nursing home. But, soon thereafter, a Coastal Manor nurse again called the LRMC emergency room. The Coastal Manor nurse spoke to Dr. Harkleroad, who had taken over for Dr. Snow as the medical control doctor on staff. Based on the information provided by the nurse, Dr. Harkleroad concluded that the patient displayed symptoms indicative of a stroke. Dr. Harkleroad told the nurse to have the patient transported to the LRMC emergency room. Hence, Usry

4

was called back to the Coastal Manor nursing home.  This time, Usry transported

the patient to the LRMC emergency room, where the patient was admitted to the

hospital.

## C.    Coastal Manor's Complaint

After this incident, Coastal Manor managers contacted LRMC to complain

about Usry's conduct.  Althea Jackson, who serves as LRMC's Director of Human

Resources, launched an investigation.  Jackson interviewed three Coastal Manor

nurses who cared for the patient on the night in question, as well as the nurses'

supervisor.  Jackson also interviewed Usry.   Lisa Pearson, LRMC's Director of

Quality Outcomes, assisted in the investigation.  Pearson interviewed all three

doctors involved: Dr. Sobowale, Dr. Snow, and Dr. Harkleroad.[1]

The investigation found the following: the three Coastal Manor nurses

noticed that the patient displayed unusual symptoms, more specifically "right-sided

weakness."  They then contacted Dr. Sobowale, the patient's primary care

physician.  Dr. Sobowale "gave orders to have the [patient] transported to a

hospital because of a possible stroke."  The nurses therefore called an ambulance

to take the patient to the hospital.  Usry responded to this call.  But instead of

taking the patient to the hospital, Usry called the LRMC emergency room and

spoke to Dr. Snow.  Usry gave Dr. Snow incomplete information about the

---

[1]Jackson and Pearson did not interview the two LRMC employees who accompanied
Usry on the trips to the Coastal Manor.

patient's condition, "focusing only on [the patient's] symptoms suggesting low blood sugar, despite receiving information from the nurses at Coastal Manor that the [patient] might be experiencing a stroke and that Dr. Sobowale had instructed that [the patient] be transported to a hospital." The investigation thus concluded that "Usry gave [Dr. Snow] incomplete information and thereby avoided following the orders of the primary care physician," Dr. Sobowale.

After the conclusion of this investigation, LRMC terminated Usry's employment. Four people participated in this decision: (1) Jackson, the Director of Human Resources, (2) Pearson, the Director of Quality Outcomes, (3) Jim Turner, then-Director of Emergency Medical Services, and (4) Scott Kroell, the Chief Executive Officer. In early November of 2009, Jackson and Turner informed Usry that she was terminated because of her "negligence in not following Dr. Sobowale's orders" to transport the patient to the emergency room. That same month, LRMC hired three new paramedics—all of them substantially younger than Usry.

After an unsuccessful charge with the Equal Employment Opportunity Commission, Plaintiff Usry brought this lawsuit in the Southern District of Georgia. It alleged that LRMC discriminated against her on the basis of age. The district court granted LRMC's motion for summary judgment, and Usry appealed.

## II. STANDARD OF REVIEW

This Court reviews "de novo a district court's grant of summary judgment, applying the same legal standards as the district court."  Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  A court should grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Chapman, 229 F.3d at 1023 (internal quotation marks omitted).  However, a "mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Brooks v. Cnty. Comm'n, 446 F.3d 1160, 1162 (11th Cir. 2006) (internal quotation marks omitted).

Moreover, "[t]he mere existence of some factual dispute will not defeat summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  Thus, "the substantive law will identify which facts are material."  Id.

### III. DISCUSSION

**A.     Legal Framework under the ADEA**

The ADEA makes it "unlawful for an employer to" "discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  To establish a claim of unlawful age discrimination under the ADEA, a "plaintiff must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision."  Gross v. FBL Fin. Servs., 557 U.S. 167, 177-78, 129 S. Ct. 2343, 2351 (2009).  A plaintiff may do so "through direct or circumstantial evidence."  Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012).  When such a claim is based on circumstantial evidence, this Court "analyze[s] the allocation of burdens and the presentation of proof under the framework articulated in [McDonnell Douglas]."[2] Kragor, 702 F.3d at 1308.

"Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination, which 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981).  To establish a prima facie case, the plaintiff must show that: (1) she was a member of the protected group of persons between the ages of forty and seventy; (2) she was

---

[2]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).

8

subject to an adverse employment action; (3) a substantially younger person filled the position from which she was discharged; and (4) she was qualified to do the job from which she was discharged.  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1359 (11th Cir. 1999).

"Once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action."  Kragor, 702 F.3d at 1308.  Because "[t]his burden is one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000), the employer "need not persuade the court that it was actually motivated by the proffered reasons," Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  Instead, "[i]t is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  Id.

If "the employer offers evidence of a legitimate, nondiscriminatory reason for the adverse action, the McDonnell Douglas framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination vel non."  Kragor, 702 F.3d at 1308 n.1 (internal quotation marks omitted and alterations adopted).  The plaintiff can then attempt "to show that the employer's stated reason is a pretext for discrimination," which is "an opportunity to present evidence from

9

which the trier of fact can find unlawful discrimination." Id. at 1308 & n.1. Indeed, a "factfinder's disbelief of the reasons put forward by the [employer] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749 (1993). "Therefore, . . . a plaintiff is entitled to survive summary judgment . . . if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." Combs, 106 F.3d at 1529.

Here, Plaintiff Usry met her burden of establishing the initial prima facie case required to trigger the McDonnell-Douglas presumption of discrimination. LRMC has also articulated a legitimate, nondiscriminatory reason for terminating Usry. LRMC says it fired Usry because she violated company policy when she failed to follow Dr. Sobowale's orders to transport the nursing-home patient to the emergency room. That explanation, if taken at face value, constitutes a valid non-discriminatory reason for terminating Usry.

But Usry contends that LRMC's stated reason for terminating her was mere pretext for discrimination. The question, however, is whether Usry has proffered sufficient evidence from which a jury could find that LRMC's stated reason was pretextual. We turn to this issue next.

## B.    Pretext

To establish pretext, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision  . . . ." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted).    A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Brooks, 446 F.3d at 1163 (quotation marks omitted).  Under the latter approach, "[t]he plaintiff must show weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale."  Holland v. Gee, 677 F.3d 1047, 1055-56 (11th Cir. 2012) (internal quotation marks omitted).

That said, "[w]hen a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior."  Kragor, 702 F.3d at 1310-11 (internal quotation marks omitted and alterations adopted).  An employer "may terminate an employee for a good or bad reason without violating federal law."  Damon, 196 F.3d at 1361.  "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions," Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotation marks omitted), or questions "whether employment decisions are prudent or fair," Damon, 196 F.3d at 1361.

11

Accordingly, the plaintiff "is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." Chapman, 229 F.3d at 1030. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

Here, Usry has failed to proffer evidence from which a reasonable jury could find that LRMC's stated reason was pretextual. Usry has not identified evidence that would allow a fact finder to conclude that LRMC's decision makers did not believe their stated reason for terminating Usry. After interviewing Usry, the Coastal Manor nurses, and all three doctors involved in this incident, LRMC concluded that Usry (1) failed to follow Dr. Sobowale's instructions; (2) gave Dr. Snow incomplete information to circumvent Dr. Sobowale's instructions; (3) thereby violated company policy; and (4) had to be terminated as a result. The record is devoid of evidence that the four decision makers at LRMC (Jackson, Pearson, Turner, and Kroell) did not believe in the results of LRMC's investigation. In other words, there was no evidence that the decision makers gave a dishonest explanation for terminating Usry. See Kragor, 702 F.3d at 1310-11 (holding that, where a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry into pretext is limited to deciding "whether the

12

employer gave an honest explanation of its behavior"); see also Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief," the discharge does not violate federal law).

To be sure, Plaintiff Usry has presented evidence from which a jury could conclude that the results of LRMC's investigation were wrong and that LRMC made a poor decision when it terminated Usry. There are questions of fact about what happened on Halloween night in 2009. For example, a jury could believe that Usry gave Dr. Snow complete and accurate information on the phone and that Dr. Snow then instructed Usry to return the patient back to the nursing home with full knowledge of all relevant facts. At best, this would allow a jury to conclude that Usry did not actually violate company policy and that the decision to fire her was misguided.

But that is not enough to show pretext, because an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984); see Elrod, 939 F.2d at 1470 ("The inquiry of the ADEA is limited to whether [the decision makers] believed that [the discharged employee] was guilty of harassment, and if

13

so, whether this belief was the reason behind [the employee's] discharge."); cf. Kragor, 702 F.3d at 1311 (finding evidence of pretext where "the employer's actual decisionmaker, after terminating an employee for misconduct (or the appearance of misconduct), says without qualification that the employee is exceptional, did nothing wrong, did everything right, and should not have been fired"). There is no evidence here that the decision makers did not believe the results of the investigation.[3]

Because Usry has not created a question of fact about whether LRMC's proffered reason was pretextual, the district court did not err in granting summary judgment on Usry's termination claim.

## C.    Usry's "Other Circumstantial Evidence of Discrimination"

Instead of presenting evidence that LRMC's proffered reason was pretext, Usry directs the Court to two types of circumstantial evidence as support for her ADEA claim. First, she points to her co-workers' "grandma" comments. Usry, however, concedes that she has never pursued a hostile work-environment claim based on these offensive comments. Instead, she contends that such age-based remarks were probative of LRMC's discriminatory motive in terminating her. That argument fails, because Usry has not pointed to evidence that any of the four

---

[3]We reject Plaintiff Usry's assertion that LRMC has given varying and inconsistent explanations for Usry's termination. While LRMC may have used different phrasing and terminology, LRMC has consistently maintained the position that it terminated Usry because she failed to follow the orders of Dr. Sobowale, in violation of company policy.

decision makers (Jackson, Pearson, Turner, and Kroell) ever used such offensive language or that they sanctioned others making such comments. "The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." Holifield v. Reno, 115 F.3d 1555, 1556-57, 1563-64 (11th Cir. 1997) (quotation marks omitted).

Second, Usry explains that a supervisor at LRMC declined her requests for overtime work and instead assigned the overtime shifts to four younger employees. It is unclear whether Usry points to this evidence as probative of LRMC's discriminatory motive in terminating her or whether the denial of overtime is a stand-alone basis for her ADEA claim. Either way, this contention fails.

When a plaintiff alleges that a co-worker outside of her class (here, a younger employee) was treated more favorably, "[t]he plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). More specifically, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Id. Usry has not pointed to a similarly-situated comparator for her overtime claim. Three of the four younger employees who received overtime work were EMTs—as opposed to paramedics. The evidence here is uncontradicted that LRMC's policy was to assign overtime shifts to EMTs because their hourly rate is lower than the rate of

15

paramedics like Usry.  In that regard, the three EMTs are not valid comparators to Usry.

Finally, the one paramedic who received overtime shifts is also not similarly situated to Usry.  Unlike Usry, this paramedic works only for LRMC and is therefore readily available to work overtime shifts.  By contrast, Usry works a significant number of hours for two other healthcare providers.

Accordingly, Usry has not identified a similarly-situated younger employee who was treated more favorably than Usry with respect to overtime work.  Summary judgment was therefore appropriate.

## IV.  CONCLUSION

For the forgoing reasons, we affirm the district court's grant of summary judgment in favor of Defendant-Appellee LRMC.

**AFFIRMED.**