[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10503
Non-Argument Calendar
_____

D.C. Docket No. 4:13-cv-00475-CDL


JAMES FRANK REYNOLDS,

Plaintiff-Appellant,

versus

WINN-DIXIE RALEIGH INC,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(August 4, 2015)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff James Frank Reynolds appeals the district court's order granting summary judgment in favor of Winn-Dixie Raleigh Inc. ("Winn-Dixie") in his employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the False Claims Act ("FCA"), 31 U.S.C. § 3730(h).   On appeal, Reynolds argues that the district court erred by finding that Reynolds failed to establish prima facie cases of gender discrimination under Title VII and retaliation under the FCA.  After review, we affirm.[1]

## I.  BACKGROUND FACTS

**A.    Reynolds's Concerns About Possible False Claims**

Plaintiff Reynolds worked as a pharmacist in a Winn-Dixie store in Columbus, Georgia.  Reynolds worked with Georgia Todd, a female pharmacist. Todd was the pharmacist in charge, meaning she oversaw pharmacy operations and personnel, but she did not discipline or terminate other pharmacists.  Instead, the pharmacy district manager, Chad Brabston, was the immediate supervisor for both Plaintiff Reynolds and Todd.

---

[1]We review de novo the district court's grant of summary judgment, viewing all evidence in the light most favorable to the non-moving party.  Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Plaintiff Reynolds became concerned about the way Todd handled some pharmacy tasks, such as performing "partial fills" of prescriptions, billing for medications purchased using Winn-Dixie's prescription card, returning patients' prescriptions to stock, and obtaining credit from vendors for medications already billed. Plaintiff Reynolds told Todd and their pharmacy technician about his concerns and warned Todd that her actions could result in a false claim. Reynolds, however, did not report his concerns to anyone else. Plaintiff Reynolds did not file a complaint or lawsuit with the government about any of his false-claims concerns because he wanted to correct the problems internally.

A few weeks before the events giving rise to this lawsuit, Plaintiff Reynolds reported to his supervisor Brabston that he had discovered some missing Xanax pills. After conducting recounts and examining documents, Brabston and Todd concluded some of the Xanax was double-counted, and there was no discrepancy.

## B.    Reynolds's "Backdating" of a Prescription for Medicaid Coverage

On January 14, 2013, the sister of a pharmacy customer came to fill a prescription for her brother, referred to as C.J. On December 30, 2012, C.J. had undergone hip replacement surgery and was prescribed five post-operative medications, including Lovenox injections and Furosemide tablets. The written prescription for the five medications was dated January 14, 2013, and was signed

by a nurse practitioner at C.J.'s post-operative rehabilitation center. C.J. was discharged from the rehabilitation center on January 13, 2013.

Todd, rather than Plaintiff Reynolds, was on duty on January 14, 2013. Todd entered the prescription, dated January 14, 2013, into the pharmacy's computer system and learned that C.J.'s Medicaid coverage had expired at the end of December 2012. Because C.J.'s sister could not pay for the medications, especially the most expensive medication Lovenox, she left without receiving them.[2]

The next day, Plaintiff Reynolds was the pharmacist on duty and received a phone call from C.J.'s sister about the medications. C.J. was a long-term customer of Plaintiff Reynolds. After investigating, Plaintiff Reynolds understood what Todd had done (i.e., entered the January 14, 2013 date of the hard copy prescription). But Reynolds thought that C.J.'s medications would be covered by Medicaid and could be entered into the computer system with the surgery date of December 30, 2012, because the doctor's surgical plan for the hip surgery would have included an order for post-op medications.

Plaintiff Reynolds made a notation by circling the surgery date of December 30, 2012 that appeared on the hospital label at the top of the written prescription and writing the words "hip replacement" next to it, which he thought was

---

[2]The retail cost of the Lovenox was apparently $494.34.

sufficient.  To be thorough, however, Reynolds also called the doctor's office to request that the hip surgeon send documentation for the Lovenox "that was written in December from the surgical planning" that reflected the surgeon's "order for all incidentals required for the surgery."[3]  Reynolds did not believe his request was improper because a prescription is made when the doctor orders it (i.e., back on December 30, 2012), even if it is reduced to writing at a later date (i.e., on January 14, 2013).  The surgeon's office advised Reynolds that C.J. had a follow-up appointment the next day, and the surgeon would give C.J. a new hard copy of a prescription for Lovenox with a December 30, 2012 date.

Expecting the surgeon to provide the documentation, Reynolds re-entered the prescription into the computer, using the December 30, 2012 date for only the Lovenox and the Furosemide.  This process adjudicated the claim through Medicaid and generated labels for the medications.  Reynolds filled some of the medications in the prescription, including the Furosemide.  The pharmacy, however, did not have Lovenox in stock, so Reynolds ordered it for delivery the following day.  Plaintiff Reynolds placed the Lovenox label in an "owe" basket for Todd to complete and dispense to C.J.'s sister the next day.  Because Plaintiff Reynolds was very busy, he did not have time to leave a note for Todd about what had happened with C.J.'s prescription.

---

[3]Reynolds explained that he was most concerned about the Lovenox because it was a very expensive drug and also important for post-op recovery.

The next day, Todd was on duty when C.J.'s sister returned to pick up the medications.  Todd finished filling the prescription, including dispensing the Lovenox, without examining the paperwork or obtaining the updated prescription, and gave the medications to C.J.'s sister.  Although Todd did not recall dispensing the medication, she admitted that she may have given the medication thinking it was part of an "owe," and thus she would not have looked at the original prescription.  Afterward, however, Todd examined the paperwork and concluded that Plaintiff Reynolds's "backdating" of C.J.'s prescription in the computer system to the surgery date in December 2012 was not acceptable pharmacy practice and perhaps Medicaid fraud.  For this reason, on January 18, Todd reported Plaintiff Reynolds's handling of C.J.'s medications to their supervisor Brabston.

## C.    Reynolds's Suspension and Investigation

Brabston, who is not a pharmacist, forwarded Todd's report and supporting documentation to Winn-Dixie officials John Fegan and B.J. Cobb, who were pharmacists, and Bill Bandy, Brabston's direct supervisor.  Either Bandy or Cobb instructed Brabston to suspend Plaintiff Reynolds and obtain a statement from him.

On January 24, Brabston met with Todd and Plaintiff Reynolds to gather the facts, obtained Reynolds's written statement, and informed Reynolds he was suspended.  During the meeting, Brabston asked Plaintiff Reynolds to handwrite a

6

statement simply admitting to backdating C.J.'s prescription by adjudicating it with Medicaid using the December 30, 2012 date.  Reynolds refused and instead prepared a typewritten statement.

Reynolds's typewritten statement explained what happened from Reynolds's perspective.  Reynolds believed C.J.'s prescription "could legally have a service date of December 2012, incident to the surgery."  Brabston forwarded Reynolds's statement to Fegan, Cobb, and Bandy, who were investigating the report.  Brabston also coached Todd about the need to double check a prescription started by another pharmacist, but other than this warning, Todd was not disciplined for dispensing C.J.'s medications.

While on suspension, Plaintiff Reynolds obtained a hard copy of the "updated" prescription for Lovenox from C.J.'s hip surgeon with a December 30, 2012 date, which Reynolds forwarded to Todd.  Todd gave the updated prescription to Brabston, who forwarded the document to Cobb on January 28.  In addition, Plaintiff Reynolds complained to Brabston that he (Brabston) favored Todd by paying more attention to her and failing to "develop [Reynolds] as a Winn Dixie employee" by coming to observe and evaluate Reynolds at work.

On January 25, 2013, Plaintiff Reynolds sent a "follow-up statement" to Brabston further defending his actions.  Reynolds pointed out that under Georgia law, a pharmacy may use records of a doctor's drug orders "transmitted by any

7

means of communication for purposes of validating the pharmacy record" and that no fraud claim was "subject to criminal penalties without <u>proof of intent</u> to commit fraud." Reynolds further stated that "the publicly posted best practices from UW Physicians regarding dates of service [was], '. . . if assigning the completion date as the date for any service will cause problems for reimbursement, the start date may be used instead.'" Brabston forwarded Plaintiff Reynolds's follow-up statement to Fegan, Cobb, and Bandy.

On January 28, 2013, Plaintiff Reynolds also sent an email directly to Fegan and Cobb, requesting a peer review by a pharmacist because Brabston was not a pharmacist. Reynolds attached both of his prior statements, again explained his view of the situation, and expressed consternation that he was the only one suspended when Todd was the pharmacist who ultimately dispensed the medication to C.J.'s sister without collecting the updated December 30, 2012 prescription written by the hip surgeon.

## D.    Reynolds's Termination

On January 28, 2013, Fegan, Cobb, Bandy, and Victoria Wellstead in Winn-Dixie's legal department made the joint decision to terminate Reynolds. The reason for terminating Reynolds was his "backdating" of C.J.'s prescription in the pharmacy's computer system. In an email, Cobb instructed Brabston to explain to Plaintiff Reynolds that Winn-Dixie "believe[d] that fraud was intended" because

8

the only medication filled using the December 30, 2012 surgery date was the expensive Lovenox in the middle of the sequence of medications and that the other medications were filled with the January 15, 2013 date. Cobb stated that he had "discussed this with Medicaid and [Winn-Dixie is] responsible for reimbursing the cost of this prescription due to this infraction."

Brabston was not involved in the termination decision, except to inform Plaintiff Reynolds of the outcome. Likewise, while Todd made the initial report to Brabston, Todd was not involved in the decision to terminate Plaintiff Reynolds.

## II. DISCUSSION

### A. Gender Discrimination Under Title VII

When, as here, a Title VII plaintiff's employment discrimination claim is based on circumstantial evidence, courts apply the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Kidd v. Mando Am. Corp., 731 F.3d 1196, 1202 (11th Cir. 2013). Under this framework, the plaintiff must first set out a prima facie case of disparate treatment by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he was subject to an adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 (11th Cir. 2011).

If the plaintiff presents evidence of a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). If the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the articulated reason is merely a pretext for discrimination. Id.

Here, the district court concluded that Reynolds failed to establish the fourth prong of his prima facie case. Generally, when a plaintiff alleges discriminatory discipline, the plaintiff must show that the employer disciplined the similarly situated employee differently, and to be considered similarly situated, the comparator employee must have been "'involved in or accused of the same or similar conduct.'" Smith, 644 F.3d at 1326 n.17 (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)). This Court's "same or similar conduct" standard is high, requiring that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006) (citing Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)).

The district court correctly found that Todd was not a sufficient comparator to establish the fourth prong of Reynolds's prima facie case. First, Reynolds and

10

Todd did not engage in "nearly identical" misconduct. The evidence, viewed in the light most favorable to Reynolds, shows that Reynolds believed that Medicaid would cover all incidentals related to surgery performed during the coverage period. Based on this belief, Reynolds changed the date of C.J.'s prescription in the pharmacy's computer system from January 14, 2013 to December 30, 2012 to ensure coverage. Once the Medicaid claim was adjudicated, Reynolds then printed labels for the medications, ordered the out-of-stock medication, and left the task of dispensing the medications to C.J.'s sister for Todd to complete the next day.

Todd, on the other hand, simply finished what Reynolds had started and handed the medications to C.J.'s sister without realizing what Reynolds had done. Arguably, Todd should have been more aware of the prescription, given that two days earlier she had told C.J.'s sister that the medications were not covered by Medicaid. Nonetheless, Todd's dispensing medication for which coverage has already been adjudicated (as evidenced by the printed labels) and Reynolds's changing the date of the prescription in the computer system to ensure coverage are not the same conduct. Reynolds's assertions that Todd was equally culpable are unavailing.[4]

---

[4]In the district court, Reynolds alternatively argued that, even if Todd was not a proper comparator, he could still prevail on his Title VII gender discrimination claim because he presented "a convincing mosaic of circumstantial evidence" from which a jury could infer intentional discrimination. See Smith, 644 F.3d at 1328. The district court rejected this argument. On appeal, Reynolds does not advance this alternative "convincing mosaic" argument

11

Also unavailing is Reynolds's argument that he, unlike Todd, did not actually engage in any misconduct at all. The question is not whether Reynolds's conduct was in fact wrong, but whether Winn-Dixie in good faith believed that it was wrong. See Alvarez, 610 F.3d at 1266 (stating that the "question is whether her employers were dissatisfied with her for . . . non-discriminatory reasons, even if mistakenly or unfairly so"); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (limiting the inquiry to whether the employer believed the plaintiff was guilty of misconduct and if so, whether that was the reason behind the discharge and concluding that whether the employee actually engaged in the misconduct is irrelevant). Accordingly, even if Winn-Dixie wrongly believed that Reynolds's handling of the prescription constituted misconduct, the district court properly found that Reynolds did not satisfy the fourth prong of the prima facie case.[5]

For these reasons, the district court did not err in granting summary judgment to Winn-Dixie on Reynolds's Title VII gender discrimination claim.

---

with respect to his Title VII gender discrimination claim. Thus, we do not address it. See Holland v. Gee, 677 F.3d 1047, 1066 (11th Cir. 2012) (explaining that issues not briefed before this Court are deemed abandoned and are not addressed).

[5]Because we affirm the district court's ruling that Reynolds failed to establish a prima facie case of gender discrimination, we need not address Reynolds's argument that he presented evidence that Winn-Dixie's reason for terminating him was pretext.

12

## B.    Retaliation Under the FCA

The FCA's whistleblower provision provides relief to an employee who was "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1) (emphasis added). [6]  In other words, protection under this provision requires a showing that the plaintiff was engaged in protected conduct and that the employer retaliated against him "because of" that protected conduct.[7]

The district court concluded that Reynolds's evidence created a genuine factual dispute as to whether he engaged in protected activity when he raised concerns with Todd about possible false claims,[8] but Reynolds did not present evidence showing a causal connection between his protected activity and his termination.  On appeal, the parties continue to dispute whether Reynolds's conversations with Todd constituted protected activity.  We need not resolve this

---

[6]On appeal, Reynolds does not challenge the district court's granting of summary judgment on his Title VII retaliation claim, and thus has abandoned it.  See Holland, 677 F.3d at 1066.  Reynolds does, however, still argue his FCA retaliation claim

[7]We decline to address Reynolds's argument, raised for the first time in this Court and only in his reply brief, that the relevant statute is the Georgia False Claims Act rather than the FCA.  See Access Now, Inc. v. SW. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).

[8]The district court concluded, however, that Reynolds's report to Brabston about the missing Xanax was not protected activity under the FCA.  Reynolds does not challenge this ruling on appeal, and we do not address it further.

issue, however, because even assuming arguendo that Reynolds engaged in protected conduct, we agree with the district court that Reynolds did not present evidence from which a jury reasonably could find that Reynolds's suspension and termination were "because of" that protected activity.

To establish the necessary causal connection under § 3730(h)(1), the plaintiff must show that the employer was at least aware of the protected activity. See U.S. ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1304 (11th Cir. 2010) (concluding that the plaintiff's allegations in her complaint that she complained to her employer about unlawful actions that would incur significant civil and criminal liability were sufficient, if proven, "to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act"); see also U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998) (stating that the "because of" language in § 3730(h)(1) requires the employee to prove that the employer had knowledge of the protected activity and was motivated to retaliate, at least in part, by the protected activity); Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 914 (4th Cir. 1997) (stating that the plaintiff must present evidence that the employer was aware of the protected activity to show the requisite causal connection).

Here, Reynolds failed to establish causation because he did not present any evidence that the decision makers—Cobb, Bandy, and Fegan—knew that Reynolds

14

had spoken to Todd about potential false claims.  In fact, Reynolds admitted he only talked with Todd and their pharmacy technician about his concerns.

Reynolds cannot avoid this result by relying upon a "cat's paw" theory. This Court has not yet applied the cat's paw theory in an FCA retaliation case. Furthermore, this Court has indicated that while the theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor, such as in Title VII disparate treatment claims, the theory is inappropriate when the statute requires "but-for" causation. See Sims v. MVM, Inc., 704 F.3d 1327, 1335-36 (11th Cir. 2013) (concluding that "cat's paw" liability does not apply to Age Discrimination in Employment Act retaliation claims).  Nonetheless, even if we assume arguendo that the cat's paw theory applies to FCA retaliation claims, Reynolds did not present evidence to support the theory in his case.

In other employment contexts, discriminatory animus may be imputed to a neutral decision maker under a "cat's paw" theory if: (1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action; and (2) the act was a proximate cause of the adverse employment action.  See Staub v. Proctor Hosp., 562 U.S. 411, 422, 131 S. Ct. 1186, 1194 (2011).  A plaintiff may establish causation under this theory if the decision maker either followed another supervisor's biased recommendation without independently

15

investigating the complaint or conducted an independent investigation but relied on facts provided by the biased supervisor.  See id. at 420-21, 131 S. Ct. at 1193; Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999).

Reynolds contends that Todd may have had a retaliatory motive.  In the district court, however, Reynolds offered nothing but his own conjecture that Todd was retaliating against him.  Moreover, Reynolds did not present any evidence that Todd had any input in the decision to suspend and then terminate him.  To the contrary, the undisputed evidence is that Todd played no role in the employment decisions except to initially report Reynolds's "backdating" of the prescription to Brabston.  Brabston then gathered the facts and documents, including multiple statements from Reynolds.  Brabston then forwarded the evidence to Cobb, Bandy, and Fegan, who reviewed it and made their own decision.  Furthermore, in his statements, Reynolds admitted changing the January 14, 2013 date of C.J.'s prescription in the computer system to December 30, 2012.  Even if the decision makers wrongly believed Reynolds's conduct was either illegal or unprofessional, Reynolds's own admission to the conduct supports their independent determination that Reynolds should be discharged.[9]

---

[9]Reynolds also contends that the district court abused its discretion by failing to compel discovery related to his FCA claim.  We conclude, however, that Reynolds waived this issue for appellate purposes by responding to the summary judgment motion on the merits rather than accepting the district court's invitation to explain why he needed additional discovery as to his FCA claim.  In any event, there was no abuse of discretion because none of the evidence

16

For these reasons, the district court did not err in granting summary judgment to Winn-Dixie on Reynolds's Title VII gender discrimination and FCA retaliation claims.

**AFFIRMED.**

---

Reynolds sought would have shown that the decision makers knew of Reynolds's protected FCA activities or that Todd manipulated the decision makers into terminating Reynolds.